UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Delano Connolly,<br><br>  Plaintiff,<br><br>  - against -<br><br>The City of New York, Joseph Cardieri, Paul Savarese, Ian Sangenito, Alan Sputz, Susan Starker and Fredda Monn,<br><br>  Defendants. | 16 Civ.    (   )(   )<br><br>Complaint and Jury Demand |

Plaintiff, by his attorney, Michael G. O'Neill, complains against defendants as follows:

## Preliminary Statement, the Parties and Background Facts

1.      This is an action alleging discrimination in employment on the basis of gender and race in violation of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. §2000e), 42 U.S.C. §1983 and the New York City Human Rights Law (the "NYCHRL"), and retaliation for plaintiff's opposition to the discriminatory practices of defendants, in violation of the same laws.

2.      Venue is proper in the Eastern District of New York, because one or more of the defendants resides in the Eastern District of New York.

3.      Plaintiff is a male.  He is non-white and of British West Indian descent, ethnically Indian Asian.

4.      Defendant City of New York (the "City") is a municipal corporation formed under the laws of the State of New York.

5.      The Administration for Children's Services ("ACS") is an Agency of the City. ACS

1

employs attorneys within its Family Court Legal Services ("FCLS") Department. FCLS has an office in each of the five boroughs of New York City.

6.     Attorneys within FCLS are categorized according to levels.  Entry level Agency Attorney Interns attorneys have a probationary period, typically measured in months, after which they are promoted to the position of Level 1 Attorney.  Above Level 1 Attorneys, there are Level 2, 3 and 4 Attorneys.

7.     Level 3 Attorneys within the FCLS units are categorically Team Leaders.  Team Leaders supervise the legal work of lower level attorneys, but they have no responsibility for making employment decisions with respect to the attorneys whose work they supervise.

8.     Level 4 Attorneys supervise Level 3 Attorneys and Teams of attorneys and are responsible for giving performance reviews of the attorneys they supervise. Level 4 Attorneys have quasi-managerial authority.

9.     Above Level 4 Attorneys are Assistant Supervising Attorneys ("ASA") who have managerial authority.

10.     Above ASA, is the Borough Supervising Attorney, the highest ranking attorney and manager of an individual Borough Office.

11.     ACS also employs attorneys within its Employment Law Unit ("ELU") and its General Counsel's Office.

12.     The ELU is responsible for investigating complaints of employee misconduct or incompetence and for filing disciplinary charges against employees.

13.     At all relevant times, Joseph Cardieri ("Cardieri") was the General Counsel and Deputy Commissioner of ACS.

14.     At some relevant times, Paul Savarese ("Savarese") was the Supervising Attorney at the Brooklyn FCLS.

15.     At some relevant times, Ian Sangenito ("Sangenito") was the Supervising Attorney at the Brooklyn FCLS.

16.     At all relevant times, Alan Sputz ("Sputz") was the Deputy Commission of FCLS.

17.     At relevant times, Susan Starker ("Starker") was the Director of the ELU of ACS.

18.     At relevant times, Fredda Monn ("Monn") was the Director of the ELU of ACS.

19.     During all relevant times, plaintiff has been an attorney licensed to practice law in the State of New York.

20.     In August, 1999, plaintiff was hired by ACS as an entry level attorney assigned to the Brooklyn FCLS office.

21.     Plaintiff passed his probationary period and was promoted to a Level 1 Attorney several months after he was hired.

22.     In April, 2001, plaintiff was promoted to Level 2 Attorney.

23.     In April, 2005, plaintiff was promoted to Level 3 Attorney.

24.     In 2006, plaintiff was promoted to the position of Team Leader.  At that time, plaintiff was assigned to supervise the legal work of a team of approximately six attorneys representing ACS in New York State Family Court.

25.     At all times, plaintiff's work performance met or exceeded the objectively reasonable expectations of ACS, and plaintiff received recognition for such by ACS Legal Managerial staff and the client.  Until the events at issue in this lawsuit, plaintiff was consistently given annual performance evaluations individual category ratings of "Outstanding", overall ratings of at

3

least "Very Good" and "exceeded expectations."

## The Discriminatory Culture And Environment Of FCLS

26.     During all times, ACS has discriminated in favor of Caucasian women and against men

in general and minority men in particular, in the hiring and promotion of attorneys in FCLS.

27.     During the relevant time period, Caucasian women have consistently comprised

approximately 75 percent of the FCLS staff.  Throughout plaintiff's 16 years of employment,

there has not been one Hispanic/Latino male attorney hired within the Brooklyn FCLS office.

28.     During the relevant period of time, in relation to the attorney population of ACS, very

few minorities in general, and minority men, in particular, are promoted above Level 2

Attorney.

29.     During the relevant time period, plaintiff was the only minority male holding the

position of Level 3 Attorney Team Leader within the Brooklyn FCLS office.

30.     Caucasian women are also typically promoted faster and sooner than non- Caucasians

and men.  Although plaintiff was promoted to Level 3 Attorney in 2005, despite exemplary

performance and recognition of such by his colleagues and the client, by 2012 he had received

no further promotions applied for.  Comparable Caucasian women are typically promoted to

Level 4 within five to eight years after starting their careers at FCLS.

31.     For example, in 2011, a Caucasian woman (YT) was promoted to Level 4 over plaintiff.

YT had been employed by ACS as an attorney only since 2006 and had approximately five

years of total legal experience.  In contrast, plaintiff had been a lawyer for twelve years and a

Level 3 Attorney Team Leader within FCLS for six years.

32.     Furthermore, at least four subordinate attorneys at FCLS had filed complaints of

4

abusive treatment against YT and requested transfer from, or discomfort with, her legal supervision.  None of those complaints had been referred to the ACS ELU.

33.     Similarly, in or about 2013, another Caucasian woman, KA, was promoted to Level 4 over plaintiff.  KA had been employed by ACS as an attorney only since in or about 2004 and had approximately nine years of total legal experience.  In contrast, plaintiff had been a lawyer for twelve years and a Level 3 Attorney Team Leader within FCLS for six years.

34.     Furthermore, upon information and belief, KA was under investigation by the ELU of ACS at the time of her promotion to a Level 4 position which resulted in a substantiated charge regarding the complaint. No disciplinary charges or penalty regarding the complaint and finding of employment discrimination was made or instituted by the ACS ELU.

35.     Similarly, in 2013, another Caucasian woman, LG, who had become an attorney only in 2005, was promoted over plaintiff to the position of Assistant Supervising Attorney. LG maintained this position despite the fact that a number of employees, including plaintiff, had filed complaints about her abusive behavior and requested to be removed from her supervision. None of those complaints were referred to the ACS ELU.

## FCLS's Tolerance of Inappropriate Sexual Behavior Among Caucasian Attorneys

36.     ACS has no rule prohibiting relationships between co-workers, or even supervisors and subordinates for that matter, and such relationships were relatively common and openly engaged in at the Brooklyn FCLS and elsewhere within ACS.

37.     FCLS tolerates romantic relationships among Caucasian attorneys irrespective of difference in supervisory position.

38.     For example, upon information and belief, defendant Savarese, who was the

Supervising Attorney at Brooklyn FCLS for part of the relevant time period, dated a married, junior attorney (LB) *under his supervision*.  Not only was it inappropriate for Savarese to date a woman under his supervision, an Assistant Supervising Attorney within the Brooklyn Office facilitated in the relationship.

39.     Another Caucasian Manager, defendant Sangenito, who was married at the time, became involved simultaneously with *two* subordinate female attorneys in the Brooklyn FCLS. As a result of these relationships, the two female attorneys, JP and KW, became involved in an altercation with each other, apparently as a result of their competition for IS's affection, in the offices of Brooklyn FCLS.  Sangenito was not disciplined and did not suffer any adverse employment action for his lack of discretion or for having simultaneous, ongoing intimate relationships with two female subordinates.

40.     Indeed, despite ACS having knowledge of his aforementioned relationships, Sangenito was promoted and became the Supervising Attorney of the Brooklyn FCLS office succeeding defendant PS.

41.     Additionally, one of defendant Sangenito's aforementioned romantic interests, KW, became confrontational, hostile and threatening to another female ACS attorney who questioned the behavior of Sangenito.

42.     Although ACS has rules that purport to prohibit and provide redress for sexual harassment, racial and employment discrimination, and inappropriate conduct, such rules are unevenly enforced, if at all.

43.     For example, in 2008, plaintiff complained to Savarese that JN, a Caucasian female attorney, had been making inappropriate sexual comments about plaintiff and was trying to

engage several other female, entry level attorneys in sexual gossip about plaintiff.  Plaintiff also informed Savarese that the aforementioned acts of JN caused the female entry level attorneys to become uncomfortable and provided Savarese with the names of the affected attorneys. Savarese did not forward plaintiff's complaint to ESU or take any action with respect thereto.

44.     In 2009, plaintiff complained to Savarese that a Caucasian female attorney (RA) was aggressively attempting to initiate a relationship with plaintiff to the point that plaintiff felt that he was being stalked.  Savarese did not forward plaintiff's complaint to ESU or take any action with respect thereto.

45.     In fact, two years later, over plaintiff's objection, Savarese assigned RA to work on plaintiff's team under his supervision.

46.     In 2011, a Caucasian Level 3 Attorney Team Leader routinely engaged in unwanted hugging and kissing of the female attorneys under his supervision, without discipline or consequences despite complaints being made by such female attorneys.

47.     In 2013, a minority attorney employee made an official complaint to the ACS OEEO unit alleging sexual harassment, racial discrimination, and disability discrimination against 3 Caucasian supervisors, TB, JB, and KA; all of which had direct supervisory authority and control over complainant, and whose decision making processes affected the employment of the complainant.  At no time during the investigation process were the 3 supervisors removed from the Brooklyn FCLS office, separated from the minority complainant, nor were they removed from their supervisory positions; in fact, one of the supervisors, KA, was promoted to a Level 4 Quasi-Managerial position *while under investigation*.  Another of the supervisors, TB, had a successive history of making inappropriate and disparaging racial comments to

African American attorney employees; *conduct which continued into February of 2014 –* irrespective of the aforementioned 2013 racial discrimination complaint.

48.     Despite a plethora of documentation and evidence, ACS unsubstantiated the complaints of the aforementioned complainant. Only after diligent pursuit and painstaking consistent complaint by the complainant did ACS reverse its determination and make an ultimate finding in or about 2014 of employment discrimination against the 3 Caucasian supervisors.  Despite such a finding by ACS, none of the 3 various level supervisors were removed from their supervisory positions, none were transferred from the Brooklyn FCLS office or separated from the complainant, nor, upon information and belief, were any disciplinary charges filed against the 3 supervisors by the ACS ELU office.

49.     Subsequent to the aforementioned 2013 discrimination complaint, in 2015 the complainant made ACS aware that in December 2014 and January of 2015, supervisor JB and another supervisor, ML, were engaging in harassing and intimidating conduct in retaliation for her aforementioned employment discrimination complaint.  Despite such further complaint to ACS, the 2 supervisors were not removed from their supervisory positions, were not transferred from the Brooklyn FCLS office or separated from the complainant, nor were any disciplinary charges filed against the 2 supervisors by the ACS ELU office.

50.     In 2015 defendant Sangenito was made aware that the aforementioned Caucasian female supervisor, ML, addressed a male, minority entry level attorney under her direct supervisory control and authority in a hostile, condescending, demeaning and inappropriate manner to the point that the aforementioned attorney felt degraded and humiliated.  No referral of the complaint to the ACS ELU was made by Sangenito.

51.     Again in 2015, upon information and belief, defendant Sangenito was made aware that the same Caucasian female supervisor, ML, addressed a male, Level 2 attorney under her direct supervisory control and authority in a hostile, condescending, demeaning and inappropriate manner to the point that the aforementioned attorney was reduced to tears and necessitated a medical leave from work.  No referral of the complaint to the ACS ELU was made by Sangenito.

52.     In or about January of 2016, the aforementioned Caucasian female supervisor, ML, again addressed the aforementioned male, minority attorney under her direct supervisory control and authority in a hostile, condescending, demeaning and inappropriate manner to the point that the said attorney felt degraded and humiliated.  He complained of such to his Level 4 Senior Team Leader and an Assistant Supervising Attorney.   No corrective of disciplinary action was taken against the Caucasian female supervisor and no referral of the complaint to the ACS ELU was made.

**Plaintiff's Brief Relationship With Co-Worker SS**

53.     Beginning in about June, 2011, plaintiff engaged in a consensual romantic relationship with a Caucasian, female co-worker, "SS."  SS was, like plaintiff, an attorney at the Brooklyn FCLS.  SS was not on plaintiff's team and plaintiff had no supervisory authority over her.

54.     In around October, 2011, plaintiff began to distance himself from SS, largely because of her erratic behavior.

55.     SS made great efforts to continue her relationship with plaintiff, however, and she sent him numerous emails and other messages to that effect.  For example, in the course one day in October, 2011, despite being told by plaintiff to cease contact, SS sent plaintiff at least 33

successive messages via her ACS issued Blackberry phone, expressing her dismay over the fact that plaintiff was ending their relationship.

56.     SS continued to badger plaintiff in November and December, 2011.

57.     On December, 28, 2011, in an attempt to incite a jealous reaction from plaintiff, SS emailed plaintiff a series of photos of her having sex with a man she claimed to have met on Craigslist.

58.     On January 1, 2012, SS sent plaintiff Blackberry messages stating that she was engaging in additional, anonymous sexual encounters via Craigslist, and she described one such encounter in detail.

59.     On January 3, 2012, SS sent plaintiff Blackberry messages indicating her unhappiness and discontent over her (mistaken) belief that plaintiff was becoming romantically involved with a mutual female acquaintance (KR), and a direction that plaintiff immediately cease the perceived relationship.

60.     The same day, SS wrote an email to plaintiff stating "I FUCKING LOVE YOU FOR CHRIST SAKE."

61.     On January 4, 2012, SS again tells plaintiff by email that she loves him.

62.     On January 6, 7, and 8, 2012, SS repeatedly called and messaged plaintiff to his work Blackberry asking that he join her and her 18 year old female cousin at various bars to have drinks.  SS sent pictures of herself and her cousin to plaintiff from the bars at which they were drinking. Plaintiff declined to join SS and her cousin.

63.     On January 8, 2012, SS sent plaintiff a song by a popular singer.  The song describes a woman bent on revenge who promises to destroy her former lover and make him burn.

10

64.     On January 9, 2012, SS sent plaintiff Blackberry messages apologizing for the previous day.

65.     Later that day, SS learned that plaintiff had spoken to KR over the weekend, and she then proceeded to make allegations of workplace sex harassment against plaintiff.

**Defendants' Bad Faith Handling of SS's Sex Harassment Complaint.**

66.     ACS has never provided to plaintiff a copy of SS's actual complaint. Indeed, it is not even clear that SS ever made an actual "complaint" and if so, if SS's complaint was in writing. According to ACS's position statement filed with the United States Equal Employment Opportunity Commission ("EEOC"), SS made a "series of allegations" about plaintiff, which served as the basis of a "formal EEO complaint filed on behalf of ACS." Although plaintiff was given a copy of the complaint made by ACS, he has never been given a copy of any allegations allegedly made by SS.

67.     According to ACS, SS alleged that plaintiff hit her and grabbed her on a number of occasions and requested that she perform sex acts in exchange for supervising her work and threatened adverse actions against her if she broke off their relationship. ACS also alleged that plaintiff had engaged in sexual harassment in a previous job.

68.     SS's allegations were largely meritless on their face. Since plaintiff had no supervisory authority or position as related to SS, it would have been quite impossible for him to have demanded sex in exchange for supervision of her work or for him to take any adverse action against her if she broke off their relationship. The allegation that plaintiff had engaged in sexual harassment in a previous job was completely immaterial to any legitimate interest of ACS. Not insignificantly, that employment had ended *almost twenty years* before SS made her

11

allegations.

69.     ACS already had in its possession all of the emails and messages between plaintiff and

SS that were sent using their ACS issued Blackberry phones.  After being informed of SS's

charges, plaintiff provided a large quantity of additional emails between SS and him from their

personal email accounts.

70.     The emails provided by plaintiff together with the material from ACS's Blackberry

server demonstrated beyond any possible or serious question that SS's allegations of

harassment were frivolous, and made out of anger for plaintiff terminating the consensual

relationship.  Among other things, this material showed:

        a.      The relationship between SS and plaintiff was in all respects consensual.

For example, at the very beginning of their relationship, SS wrote "I need you to devour

me tomorrow.  Please take me to the nearest bed and have me."  Two days later she

wrote "You really turn me on so much I can't even explain.  Today in your office at the

end of the day?  I wanted you to lay me down on that desk and have it all right then and

there."

        b.      The allegation that plaintiff somehow coerced SS into a relationship with

him was totally false.  For example, at the beginning of their relationship, plaintiff

wrote "I think we should take a few steps back at this point.  I am concerned about your

comfort at work given this."  In response, SS wrote "I disagree with you but whatever

you want is what we'll do.  If you change your mind you know where to find me,

because I'm still attracted madly to you and this hurts."

        c.      As the relationship progressed, SS's emails spoke of her intense love and

her desire to marry the plaintiff and have a child by plaintiff.

        d.      Out of scores if not hundreds of communications, there is not the slightest hint of any coercion, intimidation, compulsion, or physical aggression on plaintiff's part.  In fact, when SS complained that her estranged husband was physically abusive towards her, plaintiff advised her to call the police and take steps to protect herself.

        e.      The emails also showed that plaintiff was the one who broke off the relationship, that SS had a hard time accepting that fact, and that, right up to the day that SS made her allegations of harassment, she was continuing to pursue the plaintiff.

        f.      Finally, in sending plaintiff a popular song about a woman bent on getting revenge against a former lover, SS was plainly foreshadowing her meritless allegations of harassment.

71.    Although ACS had the wherewithal to determine almost immediately that SS's allegations were without any basis, ACS, acting through the individual defendants, decided to use these charges to conduct a witch hunt of plaintiff, isolate and blacklist plaintiff, and to destroy plaintiff's reputation in the workplace.

72.    ACS advised plaintiff of SS's allegations on January 9, 2012.

73.    The next day, ACS informed plaintiff that he would be transferred to Queens County FCLS where he would maintain his title of Team Leader.

74.    Two days later, ACS changed its mind and informed plaintiff he would not be a Team Leader in Queens.  This was the beginning of ACS' campaign to relieve plaintiff of his Team Leader position using pretextual assertions to justify the desired end result.

75.     Instead, plaintiff was transferred to the ACS Legal Compliance Unit ("LCU") in Manhattan.  Lawyer at LCU do not litigate cases, and LCU is considered a disciplinary assignment or a "dumping ground" for attorneys that ACS does not want in its system.

76.     Plaintiff was stripped of his Team Leader position and transferred to the LCU before SS's allegations were even accepted by ACS as the basis for a charge of discrimination.  In fact, plaintiff immediately offered to provide ACS with his and SS's emails, Blackberry telephone messages and telephone logs to demonstrate the consensual nature of his relationship with SS, but ACS refused to look at these documents – even while it was demoting plaintiff based on SS's unsworn and apparently verbal allegations.

77.     In contrast to the treatment received by plaintiff, SS was being treated much more congenial and handled with kid gloves by ACS.  In February, 2012, SS engaged in repeated physical and verbal outbursts at the Brooklyn FCLS necessitating managerial attorney staff to summon court security peace officers to escort SS from the Brooklyn FCLS Office and Brooklyn Courthouse itself.  Upon exit of the Courthouse, it was reported that SS made threats as to what would transpired when she returned to the Brooklyn Office.  On the same day, SS also appeared at the ACS "Central Office" at 150 William Street where she made additional outburst demanding to have an audience with the Deputy Commissioner of FCLS and the Director or the ACS Office of Equal Employment Opportunity.  This outrageous and unprofessional behavior was unrelated to anything having to do with plaintiff, who had been transferred out of Brooklyn FCLS weeks before.  As a probationary employee, SS had no due process rights and could have been terminated for her unacceptable behavior.  Instead, ACS put SS on involuntary "leave," for 30 days.

78.     Shortly after returning from her involuntary leave brought about by her disruptive and erratic behavior, SS was promoted to the position of Attorney Level One and given a raise in salary.

79.     In the meantime, ACS subjected plaintiff to intense and humiliating scrutiny under the guise of investigating SS's allegations of sexual harassment.  Despite having all the information necessary to determine that SS's allegations were without basis, ACS dragged out its "investigation" of plaintiff for ten months.

80.     In the course of this "investigation," ACS subjected plaintiff to repeated intrusive and embarrassing interrogations about his sex life, his relationships with women since High School, and an incident that occurred at a previous employment almost twenty years before; all with the continued threat of "disciplinary actions" should plaintiff refuse to respond to the inquiries.

81.     With no possible or arguable business necessity or need for an internal sexual harassment investigation, Plaintiff was required by ACS officials to describe the nature of the gratification that he received in having sex with SS, and asked what gratification he received from her sexual exploits with various men she encountered.  Incredibly, plaintiff was also asked what actions he took to prevent SS, an adult, married attorney, from having sex with African American men via anonymous meeting and "hook ups" on Craigslist.

82.     ACS also interviewed a succession of other female attorneys at the Brooklyn FCLS to determine whether plaintiff had "harassed" them, despite the fact that in his more than twelve years of employment no employee or otherwise had ever filed a complaint against plaintiff and there was not the slightest shred of evidence to believe that plaintiff had ever harassed anybody.

15

83.     Although ACS's "investigation" was supposed to remain confidential, and plaintiff was threatened by ACS with disciplinary action should he reveal the contents of the interviews and proceedings, the nature of SS's allegations against plaintiff soon became public knowledge within the Brooklyn FCLS, and this information quickly spread to Family Court personnel, including Court officers, Judges and Judicial staff members.

84.     ACS did nothing to prevent the rampant spread of rumors and gossip about plaintiff and took no action to determine who was responsible for breaching the confidentiality that was supposed to attach to its proceedings.

**Plaintiff's Performance At The Legal Compliance Unit**

85.     Despite the reputation of the LCU as a "dumping ground" for ACS troublemakers and those incapable of functioning elsewhere, plaintiff made significant contributions to the work and special projects of that unit.

86.     Among other things:

> •     plaintiff made suggestions for improving an ACS special project devoted to increasing parent attendance in Family Court, which were implemented by ACS's Deputy Commissioner;
>
> •     plaintiff was invited to participate in the creation of a strategic plan for FCLS;
>
> •     plaintiff was recognized by ACS's Deputy Commission for contributions to the FCLS strategic plan;
>
> •     plaintiff prepared training and continuing education materials for FCLS;

- plaintiff was assigned to various special projects to draw upon his experience and expertise in litigating Family Court matters;

## Plaintiff's EEOC Charge

87.    On June 5, 2012, plaintiff lodged a complaint of employment discrimination with the United States Equal Opportunity Employment Commission ("EEOC") against the City. Plaintiff immediately informed his supervisor of that fact.

88.    Subsequently, plaintiff filed charges of retaliation against the City.

## Defendants Begin to Retaliate Against Plaintiff

89.    Beginning in about July, 2012, defendants began to remove plaintiff from the special projects he had been working on and they began to deny plaintiff opportunities for training and advancement.

90.    Between July, 2012 and about October, 2012, defendants removed plaintiff from at least five special projects that he had been working on.  The removal of plaintiff from these projects deprived him of opportunities to work with high ranking ACS Officials, Directors and Commissioners, as well as Institutional Providers, denied plaintiff of exposure to such and valuable and marketable legal and administrative experience, which would have been valuable to plaintiff's aspirations for advancement and promotion within the Agency.

91.    In August, 2012, plaintiff was denied a lateral transfer from the LCU to the Legal Training Unit. Instead, the position was given to a less senior and less qualified applicant.

92.    On November 26, 2012, plaintiff applied for the position of Agency Attorney Level 4. Plaintiff was denied the position, and it was given to a less qualified applicant with less

seniority.

93.     On December 5, 2012, plaintiff again applied for the position of Agency Attorney Level 4.  Again, plaintiff was denied the position, and it was given to a less qualified applicant with less seniority.

94.     On January 13, 2013, plaintiff again applied for the position of Agency Attorney Level 4.  Again, plaintiff was denied the position, and it was given to a less qualified applicant with less seniority.

95.     On February 7, 2013, plaintiff again applied for the position of Agency Attorney Level 4.  Again, plaintiff was denied the position, and it was given to a less qualified applicant with less seniority.

96.     On or about October 4, 2013, plaintiff applied for the position of Assistant Supervising Attorney.  Plaintiff was denied the position, and it was given to a less qualified applicant with less seniority.

**Defendants Refuse to Return Plaintiff to Brooklyn FCLS.**

97.     Although ACS purportedly removed plaintiff from the Brooklyn FCLS office to prevent him from having contact with SS, defendants mandated that plaintiff report to the Brooklyn FCLS office (and the Brooklyn Family Court House, where SS would also likely be) in order to handle complex cases before that court.

98.     In about February, 2012, when SS was removed from FCLS for her involuntary medical mental health leave suspension, plaintiff requested to be returned to his Team Leader position within the Brooklyn FCLS.

99.     Although the purported reason that plaintiff was removed from FCLS was to separate

18

him from SS, and even though that rationale was no longer applicable, defendants refused to return plaintiff to the Brooklyn FCLS office and his former position.

100.    Between February and August of 2012, plaintiff requested on several occasions to be returned to his position as Team Leader in the Brooklyn FCLS office.

101.    In August, 2012, plaintiff again requested to be returned to the Brooklyn FCLS, as SS had not returned to Brooklyn and was working elsewhere within the agency.  An Assistant Commission of ACS told plaintiff that the agency was awaiting the results of the investigation into the charge against him before returning him to Brooklyn FCLS.  In other words, ACS was treating plaintiff as guilty until his innocence was established, and his transfer was punitive and disciplinary in nature.

102.    In about October, 2012, the ACS office of equal employment opportunity determined that the charge against plaintiff was unsubstantiated and unfounded.

103.    Despite being cleared of the charge and with no proffered reason, defendants continued to refuse to return plaintiff to his former position at Brooklyn FCLS for another six months, and not until April 8, 2013, more than fifteen months after SS's charges were first leveled against plaintiff.

## Defendants Keep Plaintiff Under An Investigatory Cloud.

104.    Even though the ACS Office of Equal Employment Opportunity determined that SS's charges against plaintiff were unsubstantiated and unfounded, defendants kept plaintiff under an investigatory cloud and shroud by advising plaintiff that the ACS Employment Law Unit ("ELU") was now initiating another, separate investigation against plaintiff and considering bringing disciplinary charges against plaintiff for so-called improper use of his Blackberry

device in connection with his emails with SS.

105.    Upon information and belief, the use of Blackberry devices within ACS by its employees for personal emails and messages is rampant, and no employee within FCLS has been disciplined for such use.

106.    Defendants never informed plaintiff as to the status of its ELU consideration of charges against plaintiff for his use of his Blackberry device.  Accordingly, the threat of these charges hung over plaintiff's head for eighteen months, which is the maximum time for which an investigation into such charges can be brought.

107.    Upon information and belief, defendants never seriously considered bringing such charges against plaintiff, because they would have been untenable, but they informed plaintiff that such charges were possible solely for the purpose of further harassment and creating fear, anxiety and doubt on plaintiff's part with respect to his employment relationship with ACS.

## Defendants Return Plaintiff To Brooklyn FCLS, But Step Up Their Retaliatory Behavior.

108.    On April 8, 2013, defendants grudgingly returned plaintiff to his former position as Team Leader in the Brooklyn FCLS office.

109.    Since his return to the Brooklyn FCLS office, plaintiff has been the target of retaliatory acts of the defendants and their designees.  He has been ostracized, unfairly disciplined and treated as a persona non grata by co-workers, management and supervisory personnel.

110.    Defendants assigned plaintiff to report to LG, a Caucasian female who had been promoted to the position of Assistant Supervising Attorney (ASA), despite having an overly aggressive and abusive demeanor and being much less experienced and being less qualified than

plaintiff.

111.    In September, 2013, LG completed plaintiff's annual performance evaluation and gave plaintiff an overall rating of "good."  LG made unwarranted criticisms against plaintiff in his role as Team Leader.  For example, LG wrote that plaintiff was "unapproachable," even though plaintiff has received regular positive feedback from his team members concerning his open door policy and his style of supervision, which his team members found preferable to the style of LG.

112.    LG also wrote that she had discerned a "tone" in one of plaintiff's communications to an ACS caseworker, despite documented, positive communications from the caseworker to plaintiff thanking him for his excellent assistance with her cases.

113.    All of plaintiff's previous evaluations had given him an overall rating of "very good," with ratings of his work as Team Leader consistently "very good" or "outstanding."

114.    The October, 2013 evaluation also criticized plaintiff for having a "tone" in complaints he had made about LG's behavior, specifically her raising her voice inappropriately, making intimidating gestures with her arms and her yelling at plaintiff in a meeting.

115.    In January, 2014, plaintiff made a complaint to his supervising attorney about LG's abusive and demeaning behavior, specifically noting that such behavior caused him fear and apprehension, made it difficult for him to discuss work related matters with LG, and requested a transfer from the team that LG was assigned.  Another Level 3 Team Leader attorney had also made a similar complaint in 2013 regarding LG, had requested to be transferred out of LG's unit because of her behavior, and refused to meet alone with LG without another designated Assistant Supervising Attorney being present.

116.    Plaintiff's supervising attorney did not forward plaintiff's complaint about LG to the ACS ELU.

117.    In February, 2014, plaintiff's supervising attorney informed plaintiff that a Foster Care caseworker had complained that plaintiff had "yelled" at her in the hallway of the Brooklyn Family Court.  Plaintiff's supervisor also stated that plaintiff had neglected to vacate a warrant issued against a youth for about two and a half months.

118.    Plaintiff's supervising attorney served plaintiff with a "disciplinary memorandum" which contained the alleged accusations of the case worker and response of plaintiff, and told plaintiff that he was referring the aforementioned two complaints about plaintiff to the ACS ELU for investigation and action.

119.    The complaints against plaintiff were without merit.  Indeed, the caseworker in question had a history of making unfounded allegations of a similar nature against others in order to divert attention from her own lack of competence, and a New York State Court Officer who had been approached by plaintiff's supervising attorney and questioned regarding the case worker's complaint, stated that he witnessed plaintiff's exchange with the case worker, that he had noticed nothing unusual about plaintiff's conversation with that caseworker, and that it simply appeared as two people discussing a case.

120.    Despite having knowledge of exculpatory and exonerating statements of at least one New York State Court Officer, at least one New York State Court Clerk, and the part Judge, defendant Sangenito failed to include statements he obtain from such within his aforementioned "disciplinary memorandum."

121.    Although requested by plaintiff on at least 3 separate occasions, defendant Starker of

the ACS ELU, and ELU Officials designated by Starker, refused to interview the aforementioned New York State Court Officer and New York State Court Clerk regarding the complaint of the case worker.  Defendant Starker's ELU is charged with investigating complaints of improper conduct by ACS employees prior to the filing of disciplinary charges against them.  As such, defendant Starker had a duty to, at the least, perform some form or perfunctory interview of the proffered witnesses. Instead, defendant Starker placed the burden upon complainant to produce "affidavits" from the witnesses in defense to charges being brought by ACS at a "step one" hearing.

122.    Defendant Sputz was also made aware of the existence of the aforementioned witnesses, the request of plaintiff that such be interviewed regarding the complaint made against plaintiff, the refusal of the ACS ELU to interview such witnesses, and the omission of the witnesses statements in the disciplinary memorandum of their subordinate, defendant Sangenito and defendant Sputz took no action to correct the improper conduct of the ELU or Sangenito.

123.    Defendant Cardieri had direct supervisory authority and control over defendant Starker and defendant Sputz and was also made aware of the existence of the aforementioned witnesses, the request of plaintiff that such be interviewed regarding the complaint made against plaintiff, the refusal of the ACS ELU to interview such witnesses, the omission of the witnesses statements in the disciplinary memorandum of his subordinate, defendant Sangenito, the refusal of defendant Sputz to take corrective and remedial action, and defendant Cardieri took no action to correct the improper conduct of the ELU, defendant Sputz or Sangenito

124.    Although the complaint regarding the warrant was factually correct, plaintiff was out of the office during much of the time in question and there were others in a position to vacate the

warrant in plaintiff's absence, and there was no prejudice to the youth, the case, or anybody else as a result of the warrant not being vacated.  The entire criticism was about what "could have" happened.

125.     ACS in general, and defendants in particular, are aware of other omissions or mistakes by FCLS attorneys with far more significant and tangible prejudice to ACS and its clients, with no adverse consequences being meted out to those attorneys by ACS.  After being informed by his supervising attorney that the issue was being referred to ELU, on May 13, 2015, plaintiff, with consent of the attorney hereinafter referenced, informed ELU of at least three instances in which a similarly situated Caucasian, female attorney had failed to take action, which resulted in the dismissal of cases brought by FCLS on behalf of ACS, and children being returned home to parents that ACS still considered to be neglectful and inappropriate caretakers of children. Despite defendant Sangenito and his supervisory designee's subjective determination and finding that the attorney had neglected her cases and that she lacked competence in several areas as an attorney, no disciplinary action was taken against her and the matter was not referred to ELU.

126.     On May 13, 2015, plaintiff also informed defendant Starker of the ELU, defendant Sputz of FCLS, as well as other ACS managerial and supervisory personnel, of at least one instance in which a similarly situated Caucasian, female supervising attorney, LG, had yelled at a Child Protective Manager (CPM), the client of the FCLS attorney, during a conference telephone call and in the presence of a Child Protective Specialist (CPS) case worker and a Level 1 FCLS attorney, to which the CPM requested LG cease yelling at her, and when LG continued her inappropriate yelling the CPM terminated the telephone call. No disciplinary

action was taken against LG and the matter was not referred to ELU.

127.    Defendants were also aware of a Caucasian female supervisor, JP, who was accused by the court of having engaged in unethical conduct by virtue of having participated in or being privy to a conversation with a represented party, utilizing information obtained from such conversation in furtherance of her application before the court, and the court then ordering ACS to reassign the case to another attorney.  No disciplinary action was taken against JP and the matter was not referred to ELU

128.    On May 14, 2014, defendants served notice of disciplinary charges being brought against plaintiff.  Plaintiff was told that the termination of his employment might be sought, and he was demoted from Team Leader to a "staff attorney."

129.    Defendants' demotion of plaintiff was intended to and did cause plaintiff substantial embarrassment and humiliation in the workplace.

130.    Upon information and belief, on or about May 14, 2014, defendants "leaked" the contents of the disciplinary charges against plaintiff to other attorneys in Brooklyn FCLS, with the result that the entire office was aware of the particulars of the charges against plaintiff.

131.    At or about the same time, at a mandatory meeting scheduled by supervisory personnel within the Brooklyn FCLS office, at least four of plaintiff's coworkers were advised that they should keep their distance from plaintiff and not associate with him.  When one of the attorneys inquired as to the reason why they could no longer associate with plaintiff, the attorney was told that association with plaintiff would be harmful to the attorney's career, would result in their being questioned by "Central Office" and drawn into the investigation being conducted by the ELU.  The attorneys were advised by supervisory personnel to which

they were subordinate, to stay as far away as possible from plaintiff.

132.    Immediately after being demoted, plaintiff was assigned 35 transfer cases.  These cases were described by the transferring attorney as a "mess."  Most of these cases were set for hearings in May and June, 2014, which gave plaintiff little or no time to get the cases in order.

133.    Upon information and belief, defendants transferred 35 problem cases to plaintiff with impending hearing dates with the intent to overburden plaintiff, and to set plaintiff up to fail.

134.    During this time, there was a shortage of experienced attorneys in the Brooklyn FCLS available to supervise lower level attorneys.  Although plaintiff was a Level Three attorney, with eight years experience as a Team Leader, had assisted in the training of entry level and senior FCLS attorneys, and was more experienced and qualified than many of the Level Four attorneys in the Brooklyn FCLS office, defendants directed its supervisory personnel to instruct its lower level attorneys not to seek supervision or assistance with their cases by plaintiff, or to even make the most minute, rudimentary legal inquiry of plaintiff, and defendants chose at least two Level Two attorneys to assist in the supervision of lower level attorneys.  Given open and mandatory direction by supervisory personnel to junior attorneys to not seek assistance or make legal inquiry of plaintiff, and passing over plaintiff and choosing junior attorneys for the task of supervision, not only was not in the best interest of the cases that ACS filed and not in the best interest of the families it purports to service, but was publicly humiliating to plaintiff and was intended to create an uncomfortable working environment for plaintiff.

135.    On June 6, 2014, plaintiff attended what is called an "informal conference," which was the step one hearing on the proposed disciplinary charges against plaintiff.  Despite plaintiff having no previous disciplinary history with ACS, a stellar work history as an attorney, and

26

defendants' alleged "progressive discipline" policy, plaintiff was informed that ACS would settle the charges against him if plaintiff accepted an unconscionable and extreme penalty of a 60 day suspension without pay.  Plaintiff refused to accept that penalty.

136.   On June 14, 2014, plaintiff attended the "step two" hearing on the disciplinary charges brought against plaintiff.  Again, defendants adhered to their demand for a 60 day suspension without pay.  Plaintiff refused to accept this penalty.

137.   On September 9, 2014, plaintiff was informed that ACS had decided to take official disciplinary action against him by suspending him for 60 days without pay.

138.   As a result, plaintiff was suspended without pay and health benefits from January 2 until March 2, 2015.

139.   Between the time that plaintiff was served with disciplinary charges and his suspension, there were at least two instances that plaintiff was aware of where senior supervisory attorneys, including defendant Sangenito, knowingly failed to take prompt action to vacate warrants against children within ACS's custody.

140.   In addition, there were complaints made against Caucasian female supervisors for inappropriate yelling, shouting or demeaning communications with male attorneys under their supervision.

141.   None of these failures to vacate warrants or complaints about inappropriate communications were referred to the ACS ELU for investigation let alone disciplinary action.

142.   The cumulative effect of the foregoing actions against plaintiff has been to destroy his reputation within FCLS and to derail his career.

**Section 1983 Liability**

143.     Individual liability under Section 1983 is based on the intentional violation of plaintiff's constitutional rights by individuals employed by the City within ACS who were all acting within the scope of their employment and under the color of state law.

144.     At all relevant times, Cardieri, Sputz, Starker, Monn, Savarese, and Sangenito were attorneys admitted to the New York State Bar. Attorney Cardieri was the General Counsel and Deputy Commissioner of ACS and during relevant times attended Employment Discrimination Law Seminars and was made aware of the latest updates in Employment Discrimination Law. Attorney Starker was the Director of the Employment Law Unit and during relevant times attended Employment Discrimination Law Seminars and was made aware of the latest updates in Employment Discrimination Law.  Attorney Monn was the Director of the Employment Law Unit and during relevant times attended Employment Discrimination Law Seminars and was made aware of the latest updates in Employment Discrimination Law.

145.     The decisions that were made with respect to plaintiff and plaintiff's employment were distributed and subject to groupthink and shared values, assumptions and prejudices.  The fundamental shared attitude among the individual defendants was the belief that middle class Caucasian women were the most desirable persons for the rank and file attorney positions representing ACS in Family Court litigation.  This assumption permeated the actions and decisions of the individual defendants, and subjected the plaintiff to an unequal, harsher set of standards than those applied to middle class, Caucasian women generally.  The individual defendants were predisposed to submit plaintiff to adverse employment actions based on conduct that was tolerated when committed by women or Caucasian employees, and it

predisposed the individual defendants to give credit to complaints and allegations about plaintiff that would have been dismissed out of hand if they had been made against a woman or a Caucasian employee.

146.    Cardieri actively participated in the events and transactions at issue in this lawsuit, including the decision to inflate SS's allegations of sex harassment to a formal complaint by ACS, the decision to remove plaintiff from the Kings County FCLS, and the demotion of plaintiff from team leader during the "investigation" of SS's complaint against plaintiff.

147.    Upon information and belief, Cardieri had full access to the materials relating to SS's complaint against plaintiff and knew that SS's allegations were without merit.  Further upon information and belief, Cardieri assisted, encouraged and permitted the adverse actions to be taken against plaintiff on the basis of the SS allegations, and Cardieri so acted, intentionally and out of actual race and gender influenced animus toward plaintiff.

148.    Furthermore, upon information and belief, Cardieri did not want plaintiff to continue working at ACS, and he actively directed the retaliatory disciplinary conduct against plaintiff.

149.    In the capacity of Supervising Attorney, Savarese was the highest ranking employee at the Brooklyn FCLS office and, as such, in a position to influence the terms and conditions of plaintiff's employment.  Savarese actively participated in the inflation of SS's meritless allegations of sex harassment against plaintiff, and Savarese was motivated to do so, at least in part, because of plaintiff's race and gender.

150.    In the capacity of Supervising Attorney, Savarese was the highest ranking employee at the Brooklyn FCLS office and, as such, in a position to influence the terms and conditions of plaintiff's employment.

151.    Sangenito actively participated in the retaliatory conduct against plaintiff.  Among other things, he was instrumental in the disciplinary charges that were brought against plaintiff.  Sangenito knew that the complaints against plaintiff were meritless, and he intentionally ignored or suppressed evidence and facts that were favorable to plaintiff and would have exculpated plaintiff.

152.    Sangenito understood that his actions were part of a larger retaliatory agenda against plaintiff, because plaintiff had angered ACS for complaining of race and gender discrimination and filing EEOC charges against the City based on the conduct of ACS employees.

153.    Sputz, Starker and Monn all actively participated in the events and transactions at issue in this lawsuit.  Sputz, Starker and Monn all actively participated in the inflation of SS's meritless allegations of sex harassment into an official ACS complaint.  Sputz, Starker and Monn all knew that the complaint against plaintiff was discriminatory, and they nonetheless actively participated in the processing of that complaint.

154.    Sputz, Starker and Monn each actively participated in some of the actions constituting retaliation against plaintiff.  Sputz, Starker and Monn each understood that their actions were part of a larger retaliatory agenda against plaintiff, because plaintiff had angered ACS for complaining of race and gender discrimination and filing EEOC charges against the City based on the conduct of ACS employees.

155.    Cardieri, Sputz, Starker, Monn, Savarese and Sangenito each actively participated in some of the actions constituting retaliation against plaintiff, and each understood that their actions were part of a larger retaliatory agenda against plaintiff, because plaintiff had angered ACS for complaining of race and gender discrimination and filing EEOC charges against the

City based on the conduct of ACS employees.  As such, Cardieri, Sputz, Starker, Monn, Savarese and Sangenito engaged in actions and conduct as a specific deterrent designed to quell and chill plaintiff's rights of free speech as guaranteed by the Constitutions of the United States New York State, and as a general deterrent for other ACS employees who would exercise their such rights as against ACS.

156.    In a bureaucracy such as ACS, where decision making and responsibility tends to be distributed, Sputz, Starker and Monn each played an important role in the discriminatory and retaliatory actions against plaintiff.  Sputz, Starker and Monn each understood that their actions contributed to and to some extent were essential to the ability of ACS to discriminate and retaliate against the plaintiff.

157.    Sputz, Starker and Monn each understood that plaintiff's rights to be free of discrimination in the workplace and to make complaints of discrimination without fear of retribution were being violated, and each was aware of his or her own role in the discriminatory and retaliatory processes.  Each chose to participate in the process of discrimination and retaliation, and none of them refused to perform acts that enabled and assisted ACS to discriminate and retaliate against plaintiff.

## Condition Precedent To Suit

158.    On about October 28, 2015, the EEOC issued plaintiff a right to sue letter on his Title VII claims.

159.    On about October 30, 2015, the EEOC issued plaintiff a right to sue letter on his Title VII retaliation claims.

160.    This action was filed within 90 days of receipt of the aforementioned right to sue letters.

## First Claim

161.    The City of New York discriminated against plaintiff in the terms and conditions of employment in violation of Title VII of the Civil Rights Act of 1964, as amended.

## Second Claim

162.    The City of New York discriminated against plaintiff in the terms and conditions of employment in violation of the New York City Human Rights Law.

## Third Claim

163.    The City of New York retaliated against plaintiff for opposing defendants' discriminatory employment practices, in violation of Title VII of the Civil Rights Act of 1964, as amended.

## Fourth Claim

164.    The City of New York retaliated against plaintiff for opposing defendants' discriminatory employment practices, in violation of the New York City Human Rights Law.

## Fifth Claim

165.    Cardieri violated plaintiff's right, guaranteed to him under the constitution of the United States of America, to be free of discrimination on the basis of his race and gender, for which Cardieri is liable under 42 U.S.C. §1983

## Sixth Claim

166.    Cardieri violated plaintiff's right guaranteed to him under the constitution of the United States of America, to oppose discriminatory practices in public employment, for which Cardieri is liable under 42 U.S.C. §1983.

## Seventh Claim

167.    Cardieri discriminated against plaintiff in the terms and conditions of employment in violation of the New York City Human Rights Law.

## Eighth Claim

168.    Cardieri retaliated against plaintiff for opposing defendants' discriminatory employment practices, in violation of the New York City Human Rights Law.

## Ninth Claim

169.    Savarese violated plaintiff's right, guaranteed to him under the constitution of the United States of America, to be free of discrimination on the basis of his race and gender, for which Savarese is liable under 42 U.S.C. §1983.

## Tenth Claim

170.    Savarese discriminated against plaintiff in the terms and conditions of employment in violation of the New York City Human Rights Law.

## Eleventh Claim

171.    Sangenito violated plaintiff's right guaranteed to him under the constitution of the United States of America, to oppose discriminatory practices in public employment, for Sangenito which is liable under 42 U.S.C. §1983.

## Twelfth Claim

172.    Sangenito retaliated against plaintiff for opposing defendants' discriminatory employment practices, in violation of the New York City Human Rights Law.

## Thirteenth Claim

173.    Sputz, Starker and Monn each violated plaintiff's right, guaranteed to him under the constitution of the United States of America, to be free of discrimination on the basis of his race and gender, for which Sputz, Starker and Monn are liable under 42 U.S.C. §1983

## Fourteenth Claim

174.    Sputz, Starker and Monn each violated plaintiff's right guaranteed to him under the constitution of the United States of America, to oppose discriminatory practices in public employment, for which Sputz, Starker and Monn each are liable under 42 U.S.C. §1983.

## Fifteenth Claim

175.    Sputz, Starker and Monn each discriminated against plaintiff in the terms and conditions of employment in violation of the New York City Human Rights Law.

## Sixteenth Claim

176.    Sputz, Starker and Monn each retaliated against plaintiff for opposing defendants' discriminatory employment practices, in violation of the New York City Human Rights Law.

WHEREFORE, plaintiff demands judgment for all relief permitted by law, including but not limited to awarding plaintiff a money judgment for his damages, awarding plaintiff punitive damages against the individual defendants, awarding equitable relief under Title VII, awarding pre-verdict, post-verdict and prejudgment interest and costs, awarding to plaintiff a statutory attorneys' fee and granting such further and additional relief as the Court deems just and appropriate under the circumstances.

Dated: New York, New York                 MICHAEL G. O'NEILL
      January 28, 2016                      (MO3957)

_____

Attorneys for Plaintiff
30 Vesey Street, Third Floor
New York, New York 10007
(212) 581-0990


## Jury Demand

Plaintiff demands trial by jury on all issues.

Dated: New York, New York                 MICHAEL G. O'NEILL
      January 28, 2016                      (MO3957)

_____

Attorneys for Plaintiff
30 Vesey Street, Third Floor
New York, New York 10007
(212) 581-0990