EEOC FORM 131 (11/09)

# U.S. Equal Employment Opportunity Commission

Ms. Susan Starker
Director, Employment Law Unit
NYC ADMINISTRATION FOR CHILDREN'S SERVICES
150 Williams Street, 6th Floor
New York, NY 10038

PERSON FILING CHARGE

**Delano Connolly**

THIS PERSON *(check one or both)*

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.

**520-2012-02571**

## NOTICE OF CHARGE OF DISCRIMINATION

*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act (Title VII) [ ] The Equal Pay Act (EPA) [ ] The Americans with Disabilities Act (ADA)

[X] The Age Discrimination in Employment Act (ADEA) [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.
2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.
3. [X] Please provide by **30-OCT-12** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.
4. [X] Please respond fully by **30-OCT-12** to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.
5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **09-OCT-12** to **Stephanie Marino, ADR Coordinator, at (215) 440-2819**
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**William D. Cook**
**Enforcement Manager**
*EEOC Representative*

*Telephone* **(215) 440-2634**

**Philadelphia District Office**
**801 Market Street**
**Suite 1300**
**Philadelphia, PA 19107**
**Fax: (215) 440-2604**

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] Race [X] Color [X] Sex [ ] Religion [ ] National Origin [X] Age [ ] Disability [X] Retaliation [ ] Genetic Information [ ] Other

See enclosed copy of charge of discrimination.

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| September 28, 2012 | Spencer H. Lewis, Jr.<br>District Director | [signature] |

EEOC Form 5 (5/01)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: [ ] FEPA [X] EEOC

Agency(ies) Charge No(s): 520-2012-02571

New York State Division Of Human Rights and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Delano Connolly | [redacted] | [redacted] |

| Street Address | City, State and ZIP Code |
|---|---|
| 304 Bay 14th Street | Brooklyn, NY 11214 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Administration for Children's Service | 500+ | (212) 341-3478 |

| Street Address | City, State and ZIP Code |
|---|---|
| 150 Williams Street, New York, NY 10038 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (*Check appropriate box(es).*)

[X] RACE [X] COLOR [X] SEX [ ] RELIGION [ ] NATIONAL ORIGIN
[X] RETALIATION [X] AGE [ ] DISABILITY [ ] OTHER (*Specify below.*)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest Latest

[X] CONTINUING ACTION

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s)*):

See attached charge particulars

EEOC-NYDO-CRTIU
JUL 05 2012
RECEIVED

I believe my rights have been violated under Title VII of the Civil Rights Act of 1964, as amended, as well as the Age Discrimination in Employment Act of 1967 (ADEA), as amended and have been a victim of retaliation due to my complaints of discrimination.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – *When necessary for State and Local Agency Requirements*

I declare under penalty of perjury that the above is true and correct.

6/26/12 [signature]
Date Charging Party Signature

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT [signature]

ETHAN WOLF
NOTARY PUBLIC, State of New York
No. 02WO6214184
Qualified in Kings County
Commission Expires April 12, 2014

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

26 June 2012

1- **DISPARATE TREATMENT; RACE/COLOR, GENDER DISCRIMINATION-** Title VII makes it unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In order to establish a prima facie case of discrimination in violation of Title VII, a plaintiff who asserts that he has been wrongfully terminated or discriminated against must show that: (1) he is a member of a protected class; (2) he satisfactorily performed the duties of his position; (3) he was subject to an adverse employment action; and (4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class. See, e.g., Stern v. Trustees of Columbia Univ., 131 F.3d 305, 311-12 (2d Cir. 1997); Scaria v. Rubin, 117 F.3d 652, 653-54 (2d Cir. 1997); Fisher v. Vassar College, 114 F.3d at 1335; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37; Hargett v. National Westminster Bank, USA, 78 F.3d 836, 838 (2d Cir.), cert. denied, 519 U.S. 824, 117 S. Ct. 84, 136 L. Ed. 2d 41 (1996); Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 464 (2d Cir. 1989); Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987); Ortega v. New York City Off-Track Betting Corp., 1998 U.S. Dist. LEXIS 9727, 97 Civ. 7582, 1998 WL 355416 at *5 (S.D.N.Y. July 1, 1998) (Wood, D.J.); Evans v. Golub Corp., 1997 U.S. Dist. LEXIS 17062, 96 Civ. 3889, 1997 WL 681348 at *2 (S.D.N.Y. Nov. 3, 1997); Jones v. General Bd. of Global Ministries, 1997 U.S. Dist. LEXIS 11921, 96 Civ. 5462, 1997 WL 458790 at *1 (S.D.N.Y. Aug. 11, 1997); Burger v. Litton, 1996 WL 421449 at *8; Walker v. Triborough Bridge & Tunnel Auth., 1990 U.S. Dist. LEXIS 4345, 89 Civ. 0371, 1990 WL 52139 at *3 (S.D.N.Y. April 17, 1990) (Wood, D.J.); Pearson v. Metro-North Commuter R.R., 1990 WL 20173 at *3. 'The burden of establishing a prima facie case . . . is not onerous.'" Fisher v. Vassar College, 114 F.3d at 1335 (quoting Texas v. Burdine, 450 U.S. at 253, 101 S. Ct. at 1094); see also, e.g., St. Mary's v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 2746-47, 125 L. Ed. 2d 407; Scaria v. Rubin, 117 F.3d at 654; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37; Ortega v. New York Off-Track Betting Corp., 1998 WL 355416 at *5. Establishment of a prima facie case "'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" Fisher v. Vassar College, 114 F.3d at 1335 (quoting Texas v. Burdine, 450 U.S. at 254, 101 S. Ct. at 1094); see also, e.g., St. Mary's v. Hicks, 509 U.S. at 506, 113 S. Ct. at 2747; Scaria v. Rubin, 117 F.3d at 654; Lediju v. New York City Dep't of Sanitation, 173 F.R.D. at 114; Hernandez v. New York City Law Dep't, 1997 WL 27047 at *12; Burger v. Litton, 1996 WL 421449 at *8.

A- **In or about July of 2011, while being the direct supervisor of Stacy Schecter,** Level 3 Team Leader Ken Robinson, a white male, kissed Schecter on her forehead. Schecter objected to such contact and reported such to management. Contrary to the manner in which ACS management addressed allegations by Schecter as against Connolly, a male minority attorney who was engaged in a consensual relationship with Schecter, and not Schecter's supervisor, the Robinson matter was not referred to Administration for Children's Services (ACS) Office of Equal Employment Opportunity (OEEO), and Robinson simply informed by management to keep his "damn hands off people". Management chose to address the Schecter complaint as against two similarly situated individuals in vastly different manners despite being aware that Robinson had previously engaged in similar conduct in the past with one Kelly Alvord. Management was also aware of a previous physical assault by Mr. Robinson upon a court clerk for which

Robinson was charged and received an Adjournment in Contemplation of Dismissal (ACD).

B- Connolly, a minority male, and Schecter, a white female, engaged with each other in personal use of ACS electronic equipment such as office computers and Blackberry communication devices. Although Connolly and Schecter utilized such office equipment to engage in a consensual relationship, ACS has only elected to charge Connolly with inappropriate use of the devices, penalize Connolly for such use, while ACS management has not formulated any charges or complaints as against Schecter, but has promoted Schecter to the position of a Level 1 attorney with an increase in title and monetary benefits. ACS management has treated two similarly situated attorneys in a disparate and unequal manner. At the time that ACS management elected to initiate pursuit as against only Connolly, Connolly was an 11 year veteran of ACS with no previous disciplinary actions taken as against him, and evaluations that rated "Very Good" each year, while Schecter was a new employee of 11 months and on probation.

C- Connolly has informed ACS management of Schecter's persistent and continuous requests of Connolly for sex, and her attempts to engage in sexual acts with Connolly at the work site, off the work site, and at Connolly's residence, and management has elected to ignore such reports and instead pursue a harassing course of conduct as against Connolly for alleged sexual harassment of Schecter.

D- Connolly has provided ACS management with documentation from Schecter that clearly indicates that Schecter was engaged in a consensual adult relationship with Connolly, that Schecter continuously requested personal interaction and sexual interaction with Connolly, that Schecter continuously indicated and engaged Connolly in her fantasies regarding explicit sex, marriage, and Schecter's desire to marry Connolly and have children with him, that Schecter had consistently stated to Connolly that she "loved him". Despite Connolly's testimony regarding the aforementioned, and written documentation from Schecter regarding the aforementioned, ACS management in violation of its OEEO harassment policy premised upon "unwanted conduct", pursued a harassing course of conduct as against Connolly accusing Connolly of sexually harassing Schecter.

E- Connolly has advised ACS management and provided them with documentation whereas Schecter stated to Connolly that she was vindictive, "manipulative", that she "only cared about herself", had done things to hurt others and benefit herself, and that she had engaged in bad acts in the past. Schecter also indicated that she had no remorse for any of the aforementioned bad acts, and that she had no remorse that she was consistently unfaithful to her husband. Connolly provided ACS management with threatening lyrics of a song that Schecter sent to Connolly on or about the evening of January 7, 2012, one day prior to her making her complaint as against Connolly. The aforementioned song lyrics indicating, inter alia, "You're gonna wish you never met me", " Baby, I've no story to be told, but I've heard one on you and I'm gonna make your head burn. Think of me in the depths of your despair. Make a home down there as mine sure wont be shared". ACS management has failed to investigate the aforementioned and has taken no corrective action regarding the issue.

F- Connolly has provided ACS management with the name, address, and telephone number of a witness that would indicate that Schecter followed Connolly into a men's room at a local bar in an attempt to engage in a sex act with Connolly, that an employee of the establishment had to pursue Schecter, and after numerous requests for Schecter to exit the men's room such employee has to escort Schecter out of the establishment and indicate to her "we do not allow that in here". The aforementioned evidence is exculpatory as to any allegation of sexual harassment as against Connolly as it demonstrates Schecter's attempts to initiate and voluntarily engage in sexual acts with Connolly in public areas. ACS management has failed to interview such witness.

G- Connolly has provided ACS management with the names and telephone numbers of several ACS employees that would testify that the witnessed Schecter in the presence of Connolly on a daily basis, that they witnessed Schecter pursuing Connolly, that every time they saw Schecter in the presence of Connolly that she was smiling, laughing and friendly with Connolly, that Schecter had requested of Connolly to engage in petition drafting during the "intake" process of Connolly's team, and that Schecter was heard to have stated that she was having "fun" in her relationship with Connolly and enjoyed having a husband and a relationship with Connolly. Despite provision of the aforementioned names and telephone numbers of the witnesses, ACS management has failed to avail itself of the aforementioned exculpatory evidence and has pursued a pattern of harassment as against Connolly where no reasonable person could believe a cause of action for sexual harassment would lie.

H- Connolly, a minority male attorney, has provided the ACS OEEO with testimony and/or documentation that indicate that Christine Waer, a white female attorney, has made derogatory statements to Schecter related to Connolly, to wit that Schedcter was a white 26 year old married woman and Connolly was a 45 year old, Indian, and that it was disgusting that Connolly was in a consensual relationship with Schecter, and that Waer was of the opinion that Connolly was not as pious as he purported to be and that "Oh, he's part of the Christian Coalition, the Christian Coalition". According to Schecter, after Waer made these comments, she began to laugh and further ridicule Connolly and stated that Connolly was "sleazy". These statements are in violation of , inter alia, ACS OEEO policy regarding race, color, religion and age, and were made by Waer to Schecter when Schecter was an Attorney Intern and Connolly was a Team Leader. These statements by Waer were also communicated to several other attorneys that arrived at the Brooklyn FCLS Office with Schecter as well as newly hired attorneys after Schecter's academy class. The ACS OEEO has treated Connolly in a disparate manner as opposed to Waer in that ACS OEEO has changed Connolly with allegedly making negative statements regarding Schecter's immediate supervisors however the ACS OEEO has failed to take any corrective action as against Waer and her derogatory comments regarding Connoly's race, Religion or age. Instead, ACS management has chosen to promote Waer to the position of Level 3, Team Leader whereas she will be in a direct and official supervisory position to newly hired attorneys some of which may have characteristics or traits identical to the ones of Connolly that Waer chose to make derogatory comments regarding.




I- In or about 2008, Delano Connolly, a minority male attorney, made a complaint of harassment to management (Paul Savarese) regarding Rachel Ambats, a probationary white female attorney. The complaint was not referred to the ACS OEEO by Savarese. Ambats was simply moved off Connolly's team but remained at the Brooklyn FCLS Office. After the move, and having been warned by management to cease and desist from contacting Connolly, Ambats continued to harass Connolly, in violation of ACS OEEO harassment and stalking policy via telephoning Connolly at home and in the office, following Connolly and attempting to speak with him in the hallways of the Brooklyn FCLS office and courthouse, and continuously e-mailing Connolly. Connolly repeatedly requested Ambats to cease the harassment to no avail. Connolly again reported the matter to management. The matter again was not referred to the ACS OEEO nor was confidentiality kept regarding Connolly's complaint that Ambats was harassing him via the aforementioned. ACS management failed to provide Connolly with a reasonable accommodation regarding Connolly's complaint of stalking and harassment by Ambats in that ACS management did not keep and maintain Amabats separated from Connolly. In or about 2010 ACS via Savarese placed Ambats under Connolly's aegis. Connolly expressed concern to Savarese given his prior complaint as against Ambats and as Connolly would have to function as a supervisor with respect to Ambats. Savarese simply stated that Ambats was previously spoken to, and that she understands to act appropriate. Upon information and belief, Ambats in or about June on 2011 approached Schecter and indicated to such that Connolly was "an asshole". Upon information and belief, Ambats engaged in similar harassing and stalking actions towards Kelly Alvord to the extent that Alvord had to block Ambats from contacting her via the social networking system known as "Facebook". ACS management has elected to treat Connolly in a disparate manner with respect to the current Schecter allegations. Management immediately referred the Schecter allegations to the ACS OEEO, Connolly was removed from the Brooklyn FCLS Office, witnesses were interviewed, and an OEEO complaint was drafted as against Connolly. None of these actions were taken as against Ambats despite Ambats persistent and pervasive continuous harassment of Connolly even after Ambats was warned by management to cease and desists such conduct.

J- In or about July of 2011, Schecter indicated to Connolly that she was informed by Melissa Lombrelia that management sought to "get rid of [Connolly]" due to his complaint of harassment against Rachel Ambats and Connolly's affiliation with the Civil service Bar Association (hereinafter the "Union"). Schecter also stated to Connolly that one of the reasons that individuals at the Brooklyn FCLS Office took such notice of the relationship between Schecter and Connolly was because they were 'a racial couple". Connolly has informed the ACS OEEO of the aforementioned and the ACS OEEO has failed to initiate an investigations into the matters, failed to attempt to take corrective actions or attempt to mediate the matters pursuant to the ACS OEEO policy, and has failed to ascertain why Ambats was placed back under the aegis of Connolly after Connolly had twice complained regarding the harassment by Ambats.

K- ACS management, inclusive of its OEEO, has elected to pursue charges of sexual harassment as against Connolly, a minority male, for his having engaged in consensual relationships with 3 female attorneys at the Brooklyn FCLS Office. According to the Director of the OEEO, Supervising Attorney Paul Savarese suggested that Connolly

engage in "counseling" for having engaged in consensual relationships with 3 ACS attorneys at the Brooklyn FCLS Office. ACS management has treated Connolly in a disparate manner as opposed to other similarly situated white female attorneys who have engaged in relationships with ACS attorneys and personnel at the Brooklyn FCLS Office. Upon information and belief, none of these white female attorneys have been disciplined for having engaged in relationships with co-workers in the Brooklyn FCLS Office, nor were they referred to "counseling" regarding having dated various ACS co-workers. Management is aware that many of its employees in at least the Brooklyn FCLS Office engage, and have engaged, in consensual relationships.

L- In or about 2007, Connolly made a complaint to management (Paul Savarese) regarding one Jaime Nielson/Nelson (hereinafter "Nielson"), a white female, that such had stated to several new female attorneys that Connolly had a "big dick", and Nielson requested that one of the new attorneys inquire of Connolly as to if he had a "big dick". When Nielson denied making the comment, Savarese failed to interview any of the female attorneys to which the comment was made, failed to refer the matter to OEEO, ACS management failed to transfer Neilson out of the Brooklyn FCLS Office to separate the complainant from the responding party, and Savarese simply informed the attorneys that had knowledge of the Neilson statement that the matter was not to be discussed any further and any such talk should cease. Connolly, a minority male, has been treated in a disparate manner with respect to the Schecter allegations as Savarese immediately referred the matter to the ACS OEEO, ACS management immediately transferred Connolly from the Brooklyn FCLS Office allegedly to separate the complainant from the responding party, several witnesses, spanning a 10 year period and wholly unconnected to the Schecter allegations, were summoned to the OEEO for interviews, and within 3 days the OEEO drafted a complaint as against Connolly.

M- The management of at least the Brooklyn FCLS Office has engaged in a pattern and practice of discriminating as against male attorneys, minority attorneys in general, and as to Connolly in specific, and treating such disparately from their white, female counter parts with respect to the manner in which FCLS Management hires, promotes and assigns its male and minority attorneys to various FCLS Borough Offices. Upon information and belief, Ykaterina Trambiskaya , a white , female attorney, was promoted to the Level 3, Team Leader position and was assigned to the Manhattan FCLS Office. After transferring the cases within her caseload in the Brooklyn FCLS Office to other attorneys, and just prior to starting her assignment at the FCLS Manhattan Office, Trambitskaya was instead placed in the Brooklyn FCLS Office as a Team Leader by Savarese. Upon information and belief, standard policy and procedure of ACS was not followed as there was no posting for an opening for a Level 3, Team Leader position at the Brooklyn FCLS Office for all ACS employees to apply and compete for. Savarese abused his authority and utilized his position as the Supervising Attorney of the Brooklyn FCLS Office to ensure that Trambitskaya obtained a Team Leader position at such.

N- Although equally or more qualified for promotion to a Level 4 Senior Team Leader position, Connolly was consistently denied such promotion by at least the management of the Brooklyn FCLS Offic.., and the position given to white female attorneys Lorraine Grafaggnino and Ykaterina Trambitskaya who had less seniority at ACS than Connolly.

Management at the Brooklyn FCLS Office engaged in a pattern and practice of promoting white, female attorneys over male attorneys or minority attorneys equally or more qualified for the position of Team Leader and Senior Team Leader. This preference was demonstrated by managements successive promotions of Lorraine Graffagnino, Ykaterina Trambitskaya, and Nicola Gibson. Gibson was promoted to Team Leader in preference to equally or more qualified male attorneys and minority attorneys immediately after returning from an at least 12 month maternity leave whereas she was at the time unfamiliar with newly established procedures and practices of the FCLS.

O- The management of at least the Brooklyn FCLS Office has engaged in a pattern and practice of discriminating as against male attorneys and minority attorneys in general, and as to Connolly in specific, and treating such disparately from their white, female counter parts with respect to the manner in which FCLS Management evaluates and disciplines the male and minority attorneys. Objections or complaints made by subordinate attorneys Garry Pogil, Shaina Itkin, and Ethan Wolf were failed to be documented upon the evaluations of Ykaterina Trambitskaya, a white female attorney. Such actions are in complete contrast as to the actions of management at the Brooklyn FCLS Office with respect to Connolly, a minority male. Pogil, Itkin, and Wolf all requested to be removed from under the aegis and direct supervision of Trambiskaya due to her aggressive, hostile, condescending, and intimidating demeanor. During a meeting with respect to the Pogil complaint, Assistant Supervising Attorney Jocelyn Bradley indicated to Trambitskaya in the presence of Pogil and Savarese that Trambitskaya had an aggressive attitude and that they 'know how [Trambitskaya] is", however Pogil was informed by Bradley that if he made a written complaint that it may negatively impact his opportunity for promotion as management of ACS "does not like complaints". Upon information and belief, despite the complaints of Itkin, Pogil and Wolf, no referral to the ACS OEEO were made as against Trambitskaya by Savarese or any management at ACS, no comments were made within Trambiskaya's evaluations regarding the incidents, and Trambitskaya was promoted to a Level 4 Senior Team Leader position. This position provides Trambitskaya with greater authority over Wolf and other Level 3, Level 2, Level 1, and Attorney Intern Attorneys that are employed at the Brooklyn FCLS Office and provides Trambitskaya with an increase in monetary benefits.

P- ACS has instituted in its hiring practice a pattern and practice of discriminatory hiring based upon race, gender and age in that ACS has consistently hired a substantially disproportionate amount of white, female employees under the age of approximately 30 irrespective of a pool of available male, minority law school graduate candidates, and any graduate who was over 30 years of age. The Brooklyn FCLS Office in particular has systematically discriminated against Hispanic, Arabic, Indian, Pakistani, or a potential pool of prospective employees who have the appearance and can be perceived as such, in that in the past 11 years, prior to the transfer of Connolly from the Brooklyn FCLS Office and Connolly's complaint regarding disparate treatment and impact, there had not been one Hispanic or Arabic or Pakistani attorneys hired from numerous classes of newly hired attorneys for ACS, and there had not been not more than one male Asian Indian attorney hired during the 11 year time frame. There has also been a pattern and practice of disparate and discriminatory treatment of Asian Indian males within the Brooklyn FCLS Office in that such are harassed, denied assistance, received increased or difficult

case loads, refused promotion and or suffered a "glass ceiling" effect related to promotions resulting in constructive termination of the employee.

2- **RETALIATION-** in order to make out a prima facie case of retaliation, a plaintiff must show by a preponderance of the evidence (i) participation in a protected activity known to the defendant; (ii) an employment action disadvantaging the plaintiff; and (iii) a causal connection between the protected activity and the adverse employment action." Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995); accord, e.g., Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996); Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993); Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 64 (2d Cir. 1992); Hernandez v. New York City Law Dep't, 1997 WL 27047 at *12 (citing cases); Burger v. Litton, 1996 WL 421149 at *12 n.10; Lediju v. New York City Dep't of Sanitation, 173 F.R.D. at 113; Burrell v. City Univ., 894 F. Supp. 750, 759-60 (S.D.N.Y. 1995).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its employment decision. E.g., O'Connor v. Consol. Coin, 517 U.S. at 311, 116 S. Ct. at 1309; St. Mary's v. Hicks, 509 U.S. at 506-07, 113 S. Ct. at 2747; Texas v. Burdine, 450 U.S. at 253-54, 101 S. Ct. at 1093-94; McDonnell Douglas v. Green, 411 U.S. at 802, 93 S. Ct. at 1824; Stern v. Trustees of Columbia Univ., 131 F.3d at 312; Scaria v. Rubin, 117 F.3d at 654; Fisher v. Vassar College, 114 F.3d at 1335; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 38; Lediju v. New York City Dep't of Sanitation, 173 F.R.D. at 114; Hernandez v. New York City Law Dep't, 1997 WL 27047 at *12; Burger v. Litton, 1996 WL 421449 at *8; Pearson v. Metro-North Commuter R.R., 1990 WL 20173 at *2. The burden on the defendant at this phase is one of production rather than persuasion. E.g., St. Mary's v. Hicks, 509 U.S. at 507, 113 S. Ct. at 2747; Texas v. Burdine, 450 U.S. at 257, 101 S. Ct. at 1096; Scaria v. Rubin, 117 F.3d at 654; Fisher v. Vassar College, 114 F.3d at 1335; Lediju v. New York City Dep't of Sanitation, 173 F.R.D. at 114;

If the defendant articulates a non-discriminatory reason, the McDonnell Douglas burden-shifting framework drops out of the picture. See, e.g., St. Mary's v. Hicks, 509 U.S. at 510, 113 S. Ct. at 2749; Texas v. Burdine, 450 U.S. at 253, 101 S. Ct. at 1093-94; Scaria v. Rubin, 117 F.3d at 654; Fisher v. Vassar College, 114 F.3d at 1336. At this point, "in order to defeat summary judgment after such a showing by the defendant, the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trustees of Columbia Univ., 131 F.3d at 312; see also, e.g., Fisher v. Vassar College, 114 F.3d at 1336; Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204 (2d Cir. 1995); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 38; Scaria v. Rubin, 1996 WL 389250 at *10. In other words, plaintiff must show that defendant's reason was pretextual, and more likely than not discrimination was the true reason for the adverse employment consequence. *See, e.g., Scaria* v. Rubin, 117 F.3d at 654; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 38; Lediju v. New York City Dep't of Sanitation, 173 F.R.D. at 114; Hernandez v. New York City Law Dep't, 1997 WL 27047 at *12; Burger v. Litton, 1996 WL 421449 at *8. "Accordingly, a Title VII plaintiff may prevail only if an employer's proffered reasons are shown to be a pretext for discrimination, either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction - or both." Fisher v. Vassar College, 114 F.3d at 1339

A- Delano Connolly made complaint of harassment to management (Paul Savarese) regarding Rachel Ambats in 2008. The complaint was not referred to OEEO. Ambats was simply moved off Connolly's team. After the move, Ambats continued to harass Connolly via telephone at home and in the office, and via e-mail. Connolly repeatedly requested Ambats to cease the harassment to no avail. Connolly again reported the matter to management. The matter was not referred to OEEO. In or about 2010 management placed Ambats on Connolly's team again. Connolly expressed concern management and was told that Ambats was previously spoken to, and that she understands to act appropriate. Ambats in or about June on 2011 approached Schecter and indicated to such that Connolly was "an asshole".

B- In or about July of 2011, Schecter informed Connolly that two Level 2 attorneys; Melissa Lombreglia and Christine Waer, and one Level 3 attorney, her Team Leader Kelly Alvord, has on numerous occasions made negative and derogatory statements regarding Connolly. Schecter informed Connolly that Waer has called Connolly "sleazy" and admitted to Schecter that Waer did not have any personal contact with Connolly but that she had heard negative comments about Connolly, "did not like his attitude, and that Connolly was a "womanizer". Schecter indicated that Lombreglia stated to Schecter that ACS management would not attempt to penalize Schecter, that ACS management would use Schecter and Connolly's relationship to "get rid of [Connolly]" as ACS management did not like Connolly due to his Union affiliations and contact, and because Connolly had previously made a complaint against Ambats.

C- In or about July of 2011, Schecter indicated to Connolly that Level 4 Senior Team Leader Trambitskaya had referred to Connolly as a "psycho" and that Connolly had "mental issues", that Trambitskaya has made such statements to a newly hired attorney, one Alexandra Lipton, that Schecter had viewed text messages and e-mails from Trambitskaya to Lipton regarding the aforementioned, and that Trambitskaya was attempting to "destroy" Connolly as she did not like Connolly due to Connolly ending a relationship with Alvord. The ACS OEEO office has been apprised of the aforementioned by Connolly and has failed to investigate the aforementioned and has taken no corrective action regarding the issue.

D- In or about July of 2011 and September of 2011, Schecter indicated that Waer and Lombreglia were making similar negative and derogatory comments about Connolly to each of the new employee attorneys hired by ACS. In or about September of 2011, Schecter informed Connolly that her Team Leader, Alvord had stated to her that Connolly was involved with another woman while he was in a relationship with Alvord and that Alvord was unaware of such until she viewed such woman "on Court Street". Schecter also informed Connolly that Alvord requested that Schecter accompany her to Alvord's office to view a picture of a woman that Connolly had previously dated, and upon arrival in Alvord's office Schecter was shown a picture of such woman on facebook. The ACS OEEO office has been apprised of the aforementioned by Connolly and has failed to investigate the aforementioned and has taken no corrective action regarding the issue.



E- In or about July of 2011, Schecter informed Connolly that she was informed by an ACS employee, Alexandra Prophete, that Trambitskaya was attempting to create a complaint as against Connolly as Trambitskaya disliked Connolly for ended a relationship with Alvord, and that Trambitskaya and Alvord were "out to get [Connolly]" due to the ending of such relationship. Despite being provided with the aforementioned, the ACS OEEO failed to initiate any investigation regarding the matter.

F- On several occasions, Schecter indicated to Connolly that the continuous negative comments by Waer, Lombreglia, and Alvord regarding Connolly made her uncomfortable and she feared having to address the issue with supervising attorney Savarese, and that she would "die" if she were summoned by Savarese to address the aforementioned. The barrage of negative and derogatory comments regarding Connolly's character and the degrading nature of such became so consistent, pervasive and harassing to Connolly that Connolly suggested to Schecter that they end their consensual relationship and any contact so that the constant, daily, chronic disparaging comments being made by Alvord, Waer, and Lombreglia would cease, and the reports of the comments to Connolly by Schecter would cease.

G- Approximately six months after Lombreglia made her aforementioned statement to Schecter, Connolly was transferred out of the Brooklyn Office allegedly solely to separate Connolly and Schecter pending a sexual harassment complaint. Connolly was informed he would be transferred to the Queens Office of ACS and assume a similar and equivalent Team Leader position in Queens. Although transferred from the Brooklyn Office for the alleged aforementioned reason, ACS management still required Connolly to appear on mid fact finding cases in the Brooklyn Courthouse which required Connolly to enter the FCLS Brooklyn Office where Scheceter had her office, and required Connolly to appear in courtrooms, hallways, elevators etc which Schecter also utilized. Upon arrival in the Queens Office, Connolly was informed by the supervising attorney that he would not assume a Team Leader position but would simply be "covering cases that needed to be covered". Connolly was subsequently informed by ACS management that he would not be returning to the Brooklyn Office irrespective of the OEEO investigation results. In or about March of 2012, upon information and belief, Schecter was placed on a "medical/mental health suspension" for 30 days, and was thereafter transferred to the Queens FCLS Office permanently. Despite Schecter no longer being stationed at the Brooklyn FCLS Office, Connolly was not reassigned to such.

H- Connolly has previously made complaints of harassment as against Ambats for her persistent, continuous, pervasive and threatening personal confrontations and telephone calls, and emails, both in the work place and at the home of Connolly. The matter was not referred to the ACS OEEO nor was confidentiality kept regarding Connolly's complaint that Ambats was harassing him via the aforementioned. Such harassing conduct prompted ACS management to remove Ambats from Connolly's team. Despite Connolly having been the complainant and requesting assistance from ACS management to enable the harassing and pervasive conduct to cease, the ACS OEEO presently has utilized such complaint made by Connolly as against Ambats focusing not on the harassing conduct of Ambats as against Connolly, but on the interaction between Amabts and Connolly in general accusing Connolly of having "dated" Ambats in 2008 .



I- From on or about 2006 to 2008, Connolly was the "Shop Stewart" for the Civil Service Bar Association ("Union") for the Brooklyn Office and addressed various issues with management at the Brooklyn Office. From 2009 through 2011, Connolly requested assistance from the Union to address several matters with management, and had at least 3 meetings with management and the Union.

4- **HOSTILE WORK ENVIRONMENT** - To establish a hostile work environment claim, the complainant must allege conduct that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986)) (internal brackets and quotation marks omitted). The conduct must be intimidating, hostile, or offensive, with discriminatory intimidation, ridicule, and insult permeating the workplace. See Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995). All of the circumstances must be considered; a reasonable person would have to find the environment hostile or abusive, and the victim must have subjectively so perceived it. See Harris v. Forklift Sys., 510 U.S. 17, 21-23, 114 S. Ct. 367, 370-71, 126 L. Ed. 2d 295 (1993); Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995).

A- In or about 2008, Delano Connolly, a minority male attorney, made a complaint of harassment to management (Paul Savarese) regarding Rachel Ambats, a probationary white female attorney. The complaint was not referred to the ACS OEEO by Savarese. Ambats was simply moved off Connolly's team but remained at the Brooklyn FCLS Offiice. After the move, and having been warned by management to cease and desist from contacting Connolly, Ambats continued to harass Connolly via telephone at home and in the office, in the hallways of the Brooklyn FCLS office and courthouse, and via e-mail. Connolly repeatedly requested Ambats to cease the harassment to no avail. Connolly again reported the matter to management. The matter again was not referred to the ACS OEEO nor was confidentiality kept regarding Connolly's complaint that Ambats was harassing him via the aforementioned. In or about 2010 ACS via Savarese placed Ambats under Connolly's aegis. Connolly expressed concern to Savarese given his prior complaint as against Ambats and as Connolly would have to function as a supervisor with respect to Ambats. Savarese simply stated that Ambats was previously spoken to, and that she understands to act appropriate. Ambats in or about June on 2011 approached Schecter and indicated to such that Connolly was "an asshole". ACS management has elected to treat Connolly in a disparate manner with respect to the current Schecter allegations. Management immediately referred the Schecter allegations to the ACS OEEO, Connolly was removed from the Brooklyn FCLS Office, witnesses were interviewed, and an OEEO complaint was drafted as against Connolly. None of these actions were taken as against Ambats despite Ambats persistent and pervasive continuous harassment of Connolly even after Ambats was warned by management to cease and desists such conduct.

B- In or about July of 2011, Schecter informed Connolly that two Level 2 attorneys; Melissa Lombreglia and Christine Waer, and one Level 3 attorney, her Team Leader Kelly Alvord, has on numerous occasions made negative and derogatory statements regarding

Connolly. Schecter informed Connolly that Waer has called Connolly "sleazy" and admitted to Schecter that Waer did not have any personal contact with Connolly but that she had heard negative comments about Connolly, "did not like his attitude, and that Connolly was a "womanizer". Schecter indicated that Lombreglia stated that ACS management would not attempt to penalize Schecter, that ACS management would use Schecter and Connolly's relationship to "get rid of [Connolly]" as ACS management did not like Connolly due to his Union affiliations and contact, and because Connolly had previously made a complaint against Ambats. The aforementioned was relayed to the ACS OEEO by Connolly and no investigation was undertaken by the OEEO. Subsequently, despite the aforementioned, Waer was promoted by ACS to a Level 3, Team Leader position where she would be the direct supervisor of newly hired attorneys similar to that which Schecter was when Waer made the derogatory statements regarding Connolly.

C- In or about July of 2011, Schecter indicated to Connolly that Level 4 senior Team Leader Trambitskaya had referred to Connolly as a "psycho" and that Connolly had "mental issues" , that Trambitskaya has made such statements to a newly hired attorney, one Alexandra Lipton, that Schecter had viewed text messages and e-mails from Trambitskaya to Lipton regarding the aforementioned, and that Trambitskaya was attempting to "destroy" Connolly as she did not like Connolly due to Connolly ending a relationship with Alvord. The ACS OEEO office has been apprised of the aforementioned by Connolly and has failed to investigate the aforementioned and has taken no corrective action regarding the issue.

D- In or about July of 2011 and September of 2011, Schecter indicated that Waer and Lombreglia were making similar negative and derogatory comments about Connolly to each of the new employee attorneys hired by ACS. In or about September of 2011, Schecter informed Connolly that her Team Leader, Alvord had stated to her that Connolly was involved with another woman while he was in a relationship with Alvord and that Alvord was unaware of such until she viewed such woman "on Court Street". Schecter also informed Connolly that Alvord requested that Schecter accompany her to Alvord's office to view a picture of a woman that Connolly had previously dated, and upon arrival in Alvord's office Schecter was shown a picture of such woman on the social networking system known as Facebook.

E- In or about July of 2011, Schecter informed Connolly that she was informed by an ACS employee, Alexandra Prophete, that Trambitskaya was attempting to create a complaint as against Connolly as Trambitskaya disliked Connolly for ended a relationship with Alvord, and that Trambitskaya and Alvord were "out to get [Connolly]" due to the ending of such relationship. Despite being provided with the aforementioned, the ACS OEEO failed to initiate any investigation regarding the matter.

F- On several occasions, Schecter indicated to Connolly that the continuous negative comments by Waer, Lombreglia, and Alvord regarding Connolly made her uncomfortable and she feared having to address the issue with supervising attorney Savarese, and that she would "die" if she were summoned by Savarese to address the aforementioned. The barrage of negative and derogatory comments regarding Connolly's

character and the degrading nature of such became so consistent, pervasive and harassing to Connolly that Connolly suggested to Schecter that they end their consensual relationship and any contact so that the constant, daily, chronic disparaging comments being made by Alvord, Waer, and Lombreglia would cease. The ACS OEEO office has been apprised of the aforementioned by Connolly and has failed to investigate the aforementioned and has taken no corrective action regarding the issue

G- On or about January 10, 2012, Connolly was removed from the Brooklyn Office of ACS allegedly to separate Connolly and Schecter pending an OEEO investigation.

H- Only four people were aware of the allegation against Connolly: Schecter, Connolly, Savarese and Assistant Supervising Attorney Ted Baron.

I- Connolly was informed that the OEEO investigation was a confidential matter and was to remain as such.

J- Connolly was barred from discussing the allegations or facts of the investigation, or incidents relating to such.

K- No such requirement was made of Schecter, or such was not enforced if such requirement was made. Schecter has with impunity consistently espoused to attorneys for ACS, the Legal Aid Society, attorneys that represent respondents and court personnel the specifics of her allegations, and extremely derogatory and malicious accusations as against Connolly; all prior to a determination by the ACS OEEO on the merits as to any allegations as against Connolly.

L- Schecter was witnessed by at least one ACS attorney to be espousing allegations as against Connolly and discussing the specifics of her OEEO complaint.

M- Schecter's disclosures have created a hostile working environment for Connolly in that several attorneys for the Legal Aid Society and those that represent respondents have approached Connolly when he appears on legal matters at the Brooklyn Courthouse and inquired of Connolly as to if the allegations that Connolly slapped Schecter and that Connolly had Schecter perform oral sex upon him in the Brooklyn Office were true. In addition to the attorneys inquiries, Connolly has been approached by court staff and inquired as to if he "slapped" Schecter and if he had Schecter perform oral sex upon him at the Brooklyn Office. Despite having been made aware of the aforementioned disclosures, and the effect that such has had upon court staff, attorneys for the children, attorneys for the respondents, and the court, ACS management had failed to take any proactive measures to ameliorate the impact and effect; ACS management has not issued any statement to the heads of attorneys for the children or the attorneys for the respondents or court staff or the court's that ACS management is aware of the unfortunate disclosure and rumors, that the allegations are currently under investigation, that there has been no finding of any wrong doing on Connolly's part, that Connolly is an integral part of the FCLS staff and still appearing on cases within the Brooklyn Courthouse, and that there should be no pre judgment of guilt upon Connolly as the investigation has not been concluded. ACS management could have, and should have, ameliorated Schecter's disclosure and character assassination of Connolly by use of such an aforementioned

statement, by ACS management taking direct and corrective action towards Schecter for widespread dissemination of the derogatory comments and statements towards another FCLS staff attorney, for the violation of confidentiality of the OEEO process.

N- On May 8, 2012, while in an elevator at the Brooklyn Courthouse and appearing on a case, Connolly observed and overheard the following conversation between two female court officers: O1" I want to get out of my part". O2 "well if you slap me then you will get transferred out of the part, and maybe the building". Connolly verified with another ACS employee that was in the elevator at the time that she had overheard the exchange and the substance of the exchange. The exchange was stated in front of Connolly, the ACS employee and another court employee. The substance of the exchange exactly mirrored one of Schecter's allegations as against Connolly that Schecter has exposed about the courthouse.

O- On My 23, 2012, Connolly attended a training session at the Brooklyn FCLS office, with attorneys Lloyd Rogler, Harry Gelb and Ray Kimmelman. Savarese approached the desk where as Rogler Connolly and Gelb were seated, stated specifically to Rogler and Gelb that they should ensure that they placed their name on the "sign in" sheet so as they would obtain "CLE credit". Savarese then glanced at Connolly, smirked and smiled, and walked away.

P- On My 23, 2012, while Connolly was exiting a training session at the Brooklyn FCLS office, with attorneys Lloyd Rogler, Harry Gelb, Ray Kimmelman and Alan Sputz, Connolly was approached by assistant Supervising Attorney Jocelyn Bradley, and Bradley stated to Connolly that she "thought she saw someone that looked like [Connolly]" that she thought "but that could not be him, what's he doing here", and Bradley then stated to Gelb and Rogler "What did you do? You dragged him here with you?"

Q- Each time that Connolly appears in the Brooklyn courthouse, there are attorneys, court staff, and ACS personnel that used to engage in conversation with Connolly prior to Schecter's allegations and disclosure, who now no longer converse with Connolly and avoid all eye contact with Connolly. Due to the aforementioned attorneys now will not discuss cases, case matters, or information with Connolly prior to the case being before the bench. This makes it difficult to advance and discuss case progress, respondents and children's service needs, and matters related to the case. The character assassination of Connolly by Schecter, and ratified endorsed by ACS management through its lack of corrective action, has alienated Connolly from any personal and professional interaction with court staff and attorneys in the Brooklyn Courthouse.

R- In addition to court staff and attorneys in Brooklyn inquiring of Connolly, ACS and court staff in not only the Brooklyn Borough but also in at least the Boroughs of Manhattan, Queens and the Bronx have been made aware of the allegations by Schecter as against Connolly. The dissemination of the allegations, and there distortion as they get further disseminated, has created an isolation of Connolly within his profession as an attorney, and makes it extremely difficult for Connolly to interact with staff of ACS

within the Boroughs, and attend training in the Boroughs regarding ACS policy, procedures, and legal related matters.

S- Connolly has on numerous occasions informed ACS management of the aforementioned and of Schecter's disclosure and dissemination of the OEEO allegations and Connolly's inability to respond or defend as against the court wide dissemination of the allegations, and ACS management has failed to take any corrective action as against Schecter, or any other ACS employee that is wrongfully disseminating any matters related to this OEEO investigation and impugns the character of Connolly.

T- Despite Connolly having informed management and the ACS OEEO of Schecter's dissemination of the matters that the OEEO investigation, and that such has created a hostile work environment for Connolly, no adverse action was taken by management to mitigate the harassment by dissemination a statement that the Schecter allegations were currently under investigation and not established as against Connolly, no action was taken as against Schecter for such dissemination, and, instead, Schecter was promoted by management and given an increase in monetary benefit and title.

U- As aforementioned, there has been a course of conduct within the Brooklyn Office of negative, derogatory, inflammatory, obscene, and slanderous comments being made by several senior members of the Family Court Legal Services staff as against Connolly with no corrective action being taken by ACS management. Schecter has self proclaimed that she is "manipulative", and commits acts and "bad things" "guilt free" solely to benefit her individual needs. The derogatory statements by senior members of the Brooklyn FCLS attorney staff were made directly to Schecter and others, and provided Schecter the outlet and incentive to fabricate allegations as against Connolly. This situation is pervasive and continues to exist due to the inaction of management to address such, passively and actively condoning such, and by managements ignoring complaints regarding such. The statements of Lombreglia attributed to management that such wanted to "get rid of Connolly" illustrates that management is not only the source of the derogatory comments being made against Connolly, but also that ACS management enables such to continue through its attorneys by management's passive acquiescence and its active condoning such statements by its Level 4 quasi managerial attorneys, Level 3 supervisory attorneys, and Level 2 attorneys.

