SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| Delano Connolly,<br><br>                    Plaintiff,<br><br>            - against -<br><br>City of New York, Paul J. Savarese, and Does 1-10,<br><br>                  Defendants. | Index No: 501761/13<br><br>Amended Verified Complaint |

Plaintiff, by his attorney, Michael G. O'Neill, states for his amended complaint against defendants as follows:

1. Plaintiff is a male. He is non-white and of British West Indian descent, ethnically Indian Asian.

2. Defendant City of New York (the "City") is a municipal corporation formed under the laws of the State of New York.

3. Defendant Paul J. Savarese is an individual and at relevant times was employed by the City as the Supervising Attorney.

4. Does 1-15 are or were employed by the City of New York.

5. In about August, 1999, plaintiff was hired by the City as an attorney in its Administration for Children's Services agency ("ACS").

6. At all times, plaintiff's work performance and time and attendance have met or surpassed the reasonable and objective expectations of ACS for an attorney of his position. In April, 2001, plaintiff was promoted to a "Level 2" attorney, and in April, 2005, plaintiff was promoted to a "Level 3" attorney. As a Level 3 attorney, plaintiff has been responsible for supervising a team of approximately 6 attorneys representing ACS in New York State Family Court.

7. During the relevant time period up to about February, 2012, plaintiff was assigned to the Brooklyn office of ACS's Division of Family Court Legal Services ("FCLS").

8. Until some time in 2012, Savarese was the Supervising Attorney of the Brooklyn FCLS.

9. At all times during the relevant time period, ACS in general, and Brooklyn FCLS in particular, has discriminated against males and non-whites in the hiring and promotion of attorneys. For example, out of 71 attorneys in Brooklyn FCLS, 55 (77.4%) are women. Citywide, over 75 percent of all FCLS attorneys are women. The vast majority of FCLS attorneys are White, and there are very few minority men employed by ACS as attorneys within FCLS.

10. This pattern of discrimination is also reflected in the promotion of attorneys within Brooklyn FCLS. Plaintiff has repeatedly applied for Level 4 positions within Brooklyn FCLS, and he has repeatedly been passed up and women with half his experience have been promoted instead.

11. As alleged in further detail below, the discrimination within FCLS against men and minorities is not limited to hiring and promotion decisions. Discrimination within FCLS against men and minorities extends to the enforcement of workplace policy, the imposition of discipline, training and career opportunities, and, generally, the terms and conditions of employment.

12. ACS has no rule prohibiting relationships between co-workers, or even supervisors and subordinates for that matter, and such relationships were relatively common at the Brooklyn FCLS and elsewhere within ACS. For example, Savarese dated a junior attorney (LB) at Brooklyn FCLS. Not only was LB under Savarese's supervision, but Savarese was

introduced to LB by another ACS Manager, who is now the Director of ACS' Employment Law Unit, which has the responsibility for enforcing the agency's EEO policies.

13. Beginning in about June, 2011, plaintiff began a consensual romantic relationship with a White, female co-worker, "SS." SS was, like plaintiff, an attorney at the Brooklyn FCLS. SS was not on plaintiff's team and plaintiff did not supervise her.

14. During plaintiff's relationship with SS, SS had told him that various female attorneys at Brooklyn FCLS disapproved of their relationship the fact that plaintiff had dated White attorneys within Brooklyn FCLS in the past. One of these attorneys, YT, was a Level 4 supervising attorney, which was one level above plaintiff. Although YT was not plaintiff's immediate supervisor at the time, she had a close relationship with Savarese, both at work and outside of it, and Savarese had brought her into Brooklyn FCLS as a Level 4 attorney without posting the position, which is contrary to ACS policy. YT was in a position to influence Savarese and thereby impact the terms and conditions of plaintiff's employment. YT had referred to plaintiff as a "psycho" and as having "mental issues." She also informed others within Brooklyn FCLS that she intended to "destroy" plaintiff.

15. Plaintiff's relationship with SS continued until the end of 2011, at which time plaintiff ended the relationship with SS because of increasingly erratic behavior on her part. SS exhibited wild mood swings, and she started to report risky sexual and other behavior to plaintiff, such as engaging in anonymous sex via Craigs list "hookups" and even engaging in sexual activity for money. Initially plaintiff was unsure whether SS's stories were real or fantasy, until SS began to send explicit pictures of her having sex with other men.

16. Upon information and belief, after plaintiff ended his relationship with SS, SS, angry and upset, made disparaging and malicious comments about plaintiff to Savarese, YT, or

to others who related the comments to Savarese and YT.

17. Upon information and belief, Savarese, YT and others, including one or more of the Does, encouraged SS to frame her complaints against plaintiff as some form of harassment of SS by plaintiff.

18. Upon information and belief, in doing so, Savarese, YT and others, including one or more of the Does, were motivated by animus toward plaintiff's race and gender. Among other things, Savarese, YT and others, including one or more of the Does, were displeased by the fact that plaintiff, a person of color, had been dating a White female.

19. Upon information and belief, in doing so, Savarese, YT and others, including one or more of the Does, caused SS's complaints about plaintiff to be turned into a trumped up charge of sex harassment.

20. Under any rationale view of the facts, no person could reasonably have believed that plaintiff had engaged in any form of sex harassment vis a vis SS. Not only was plaintiff not SS's supervisor and had no ability to influence decisions concerning SS's career, but it was universally known within Brooklyn FCLS that plaintiff and SS were in a consensual dating relationship.

21. Furthermore, at no time during their relationship had SS ever made any kind of complaint about plaintiff to anyone. In addition to the fact that there were numerous avenues of recourse available to SS if she were being sexually harassed, but SS was an attorney at law and married to a police officer.

22. Given these facts, it was highly improbable that SS, who complained about plaintiff only after he terminated his relationship with her, had been subjected to any form of harassment whatsoever.

23. Nevertheless, having full knowledge of the relevant facts, and acting with the intent to deprive plaintiff of federally protected rights, or at least acting with reckless disregard of the probable consequences of their acts, Savarese, YT and others, including one or more of the Does, caused SS's complaints to be the subject of an internal complaint of sexual harassment against the plaintiff.

24. At the same time, plaintiff was stripped of his supervisory functions and transferred to ACS headquarters in Manhattan.

25. The purported reason for removing plaintiff from his position within Brooklyn FCLS was to separate him from SS. SS, however, was transferred to Queens FCLS at or about the same time. Furthermore, when the investigation of SS complaint was concluded in October, 2012, it was deemed unfounded. Plaintiff, however, was not returned to his position at Brooklyn FCLS until six months after that.

26. The purpose of this demotion and reassignment was to humiliate the plaintiff, to cause him to be subjected to scorn and ridicule within FCLS, to interfere with plaintiff's career, and to remove him from Brooklyn FCLS. All of this was motivated, at least in part, by animus toward plaintiff based on his race and gender.

27. SS's complaint against plaintiff was supposed to be confidential. Any party to the complaint and any ACS employee having knowledge of the complaint was under a duty not to discuss the contents of the complaint with any third parties. Any employee of ACS who violated the confidentiality of the proceeding was subject to discipline for doing so.

28. Plaintiff scrupulously maintained the confidentiality of the charge and investigation against him. Indeed, plaintiff was never informed by ACS as to the actual allegations against him. Nevertheless, both the existence of SS's complaint and apparent

details of it became public knowledge, not only within ACS, but also at the Family Court.

29. Knowledge of SS's complaint against plaintiff could only have come from SS herself or officials of ACS. Upon information and belief, SS widely disseminated the details of her complaint against plaintiff in order to humiliate and embarrass him and out of spite. In addition or alternatively, employees of ACS, including one or more of the Does, leaked the contents of SS's complaint in order to damage plaintiff.

30. Plaintiff complained to officials of ACS, including one or more of the Does, about SS's failure to keep the contents of her complaint confidential. No action was taken against SS and nobody within ACS took any steps to enforce the confidentiality of the proceedings or to mitigate the damage to plaintiff's reputation that had been caused by public dissemination of SS's complaint against plaintiff. Upon information and belief, one or more of the Does affirmatively decided not to take appropriate action in order to deprive plaintiff of his federally protected rights and out of animus toward his race, skin color, gender, or for retaliatory reasons.

31. Not only was the blatant flouting of ACS's policy of confidentiality and ACS's intentional refusal to enforce that policy designed to cause plaintiff damages, but it was also calculated to cause plaintiff to violate the same policy in self defense, thereby giving ACS a pretext for terminating his employment. Plaintiff possessed voluminous documentary evidence of the lack of merit to SS's complaint, such as photographs of SS having sex with multiple men (provided to plaintiff by SS herself), her intimate emails, her accounts of her numerous and extremely promiscuous sexual encounters with strangers, and long narratives of her fantasies involving rape and violence. It required a great deal of restraint on plaintiff's part to refrain from sharing any of this information, especially in light of the damage to his reputation that

was being caused by the dissemination of SS's complaint against plaintiff. Upon information and belief, various ACS officials, including one or more of the Does, believed that plaintiff could be provoked into violating ACS's policy of confidentiality, which could then be used as grounds for terminating plaintiff.

33. To the extent that any of defendants could have had any doubt concerning the lack of merit to the charge that plaintiff had sexually harassed SS, that doubt would have been dispelled almost immediately, because plaintiff provided ACS and one or more of the Does with copies of emails sent by SS to plaintiff during their relationship. These emails demonstrated, among other things, that the relationship was entirely consensual, that SS wanted to stay in the relationship and that SS became vindictive when plaintiff broke the relationship off. The emails also demonstrated that SS was an unstable, deeply emotionally damaged individual and called in question her credibility.

33. At about the same time, plaintiff complained to defendants, including one or more of the Does, that the charge of sex harassment was the product of gender and race discrimination within Brooklyn FCLS and FCLS generally. Plaintiff informed defendants and one or more of the Does of the disparate treatment that he had been subjected to.

34. A bona fide, legitimate investigation of the allegations of sex harassment made against plaintiff could have been concluded within a few weeks at most. ACS, acting by of one or more of the Does, however, did not conduct a legitimate investigation of those allegations. Instead, ACS, acting by one or more of the Does, spent ten months "investigating" the complaint that plaintiff harassed SS. Plaintiff was subjected to hours of grueling examination, during which he was asked detailed questions about the sex between SS and him and about other relationships that he had had with other women. These interviews did not serve any

legitimate investigatory purpose, rather, they were intended to humiliate, embarrass, annoy and upset plaintiff.

35. The conduct of the investigation was motivated, at least in part, by racial and gender bias against plaintiff, by retaliatory motive for complaining about race and gender discrimination within FCLS, and with the intent of violating plaintiff's federally protected rights, or with the reckless disregard of the consequences of the manner in which the investigation was conducted.

36. On about June 7, 2012, plaintiff filed charges of race, color and gender discrimination against the City with the United States Equal Employment Opportunity Commission ("EEOC").

37. Thereafter, plaintiff has been subjected to additional acts of retaliation. The acts of retaliation include but are not limited to: denial of training opportunities, exclusion from FCLS programs, events and activities, denial of work assignments, denial of exposure to senior ACS officials, and exclusion from notifications of the foregoing.

38. At various times, both before and after the complaint filed against plaintiff by SS, plaintiff had applied for promotions within FCLS, only to be denied those promotions and the positions filled by less experienced, less qualified White females.

39. On November 9, 2009, plaintiff applied for the position of Agency Attorney 4. He was denied that position.

40. On September 10, 2010, plaintiff applied for the position of Attorney Level 4. He was denied that position.

41. On August 30, 2010, plaintiff applied for the position of Assistant Supervising position. He was denied that position.

42. On September 23, 2010, plaintiff applied for the position of Staff Attorney. He was denied that position.

43. On March 21, 2011, plaintiff applied for the position of Attorney Level 4. He was denied that position.

44. On November 10, 2010, plaintiff applied for the position of Staff Attorney. He was denied that position.

45. On August 14, 2012, plaintiff applied for the position of Agency Attorney Level IV. He was denied that position.

46. On October 19, 2012, plaintiff applied for the position of Agency Attorney. He was denied that position.

47. On each of the foregoing occasions, plaintiff was well qualified for the position that he applied for. On the majority of the foregoing occasions, the position was given to a less qualified White person, usually female.

48. For example, YT was promoted to attorney level 4 in about 2010. YT was first admitted to practice law in 2006, and she was first employed by FCLS the same year. Plaintiff was admitted in 1999 and had been employed by FCLS since that time. Therefore, when YT was promoted to attorney level 4, plaintiff had nearly three times the experience that she did.

49. In being denied the above and other promotions, plaintiff was also treated differently than White males who had dating and intimate relationships with FCLS attorneys or other ACS employees.

50. For example, Savarese dated a married, female attorney intern, LB, who was under his supervision. Because of this relationship, LB had access to the computer and confidential emails of Savarese, the supervising attorney for the entire Brooklyn FCLS office.

Savarese was not disciplined and suffered no adverse action for his lack of discretion, for dating an employee under his supervision, or for permitting a junior employee to have access to confidential files and emails.

51. IS was a White, male attorney employed as a Level Four Attorney at the Brooklyn FCLS. While so employed, IS, who was married at the time, became simultaneously involved with two subordinate female attorneys in the Brooklyn FCLS. As a result of these relationships, the two female attorneys became involved in a physical altercation with each other, apparently as a result of their competition for IS's attention, in the offices of Brooklyn FCLS. IS was not disciplined and did not suffer any adverse employment action for his lack of discretion or for having simultaneous, ongoing intimate relationships with two female subordinates.

52. IS later had an intimate relationship with his supervisor.

53. When Savarese took a leave of absence in 2012, IS was promoted to supervising attorney of Brooklyn FCLS.

54. After SS made her complaint of sex harassment against plaintiff, Savarese (of all people!) suggested that plaintiff needed counseling, because he had dated women within Brooklyn FCLS.

55. Savarese's comment illustrated the double standard prevailing within FCLS during the relevant time frame. When White men date women under their supervision, they suffer no adverse employment action or are promoted, no matter how egregious the lack of discretion. When a man of color, however, dates White women in the workplace, the man of color needs "counseling" and is subjected to disparate and discriminatory treatment as detailed above.

*First Cause of Action*

56.     By virtue of the acts alleged herein, defendants have discriminated against the plaintiff on account of his sex in violation of the New York City and State Human Rights Law.

*Second Cause of Action*

57.     By virtue of the acts alleged herein, defendants have discriminated against the plaintiff on account of his race, ethnicity, and skin color in violation of the New York City and State Human Rights Law.

WHEREFORE, plaintiff demands judgment granting all relief provided by law, including but not limited to:

a.     Awarding plaintiff a money judgment for his damages, including but not limited to lost wages, lost benefits, other economic damages, shame, humiliation, embarrassment and mental distress;

b.     Awarding plaintiff punitive damages;

c.     Awarding plaintiff a statutory attorneys' fee;

d.     Awarding prejudgment interest and costs;

e.     Granting such further and additional relief as the Court deems just and appropriate under the circumstances.

Dated: New York, New York
        November 22, 2013

                                        MICHAEL G. O'NEILL

                                        _____

Attorneys for Plaintiff
30 Vesey Street, Third Floor
New York, New York 10007
(212) 581-0990

Verification

I am an attorney admitted to practice law in the Courts of the State of New York, and I affirm that I am associated with the attorney for the plaintiff; I have read the annexed Verified Complaint and I know the contents thereof and the same are true to the best of my information and belief, and I believe them to be true. My information and belief is based upon the investigation being conducted and a file maintained in my office.

The reason I make this affirmation instead of plaintiff is because the plaintiff does not reside in New York County where I maintain my office.

I affirm that the foregoing statements are true under the penalties of perjury.

Dated: New York, New York
      November 22, 2013

_____
Michael G. O'Neill